NICOLE S. GRAFF ET AL. *v.* ZONING BOARD
OF APPEALS OF THE TOWN OF
KILLINGWORTH ET AL.
(SC 17356)
(SC 17357)

Sullivan, C. J., and Borden, Norcott, Katz and Palmer, Js.

Argued November 21, 2005—officially released April 11, 2006

*Kenneth J. McDonnell,* for the appellants in Docket No. SC 17356 (intervening defendants Kerry O'Connell et al.).

*William Howard,* with whom, on the brief, was *David J. Tycz,* for the appellant in Docket No. SC 17357 (named defendant).

*Timothy S. Hollister,* with whom was *Beth Bryan Critton,* for the appellee (named plaintiff).

*Opinion*

BORDEN, J. The named defendant, the zoning board of appeals (board) of the town of Killingworth (town), appeals[1] from the judgment of the trial court reversing the board's decision to uphold a cease and desist order, which required the plaintiff,[2] Nicole S. Graff, to reduce the number of pet dogs on her property to four or less in accordance with the Killingworth zoning regulations (regulations). The board raises three issues on appeal, namely, that the trial court: (1) improperly concluded that pet dogs were not regulated as an accessory use under the town regulations; (2) improperly concluded that by setting an enforceable limit on the number of dogs kept in each residence, the board had enacted a

[1] This case involves two separate appeals. The first appeal was brought by the board. The second appeal was brought by Kerry O'Connell and Shawn O'Connell, as intervening defendants in this action, who were granted permission to intervene as abutting property owners, and, therefore, were " 'aggrieved person[s]' " under General Statutes § 8-8 (a) (1). The board and the intervening defendants filed separate appeals from the judgment of the trial court to the Appellate Court, which consolidated the appeals pursuant to Practice Book § 61-7. Subsequently, we transferred the consolidated appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. The claims of the intervening defendants were also raised by the board on appeal. Hereafter, references to the board's claims include those of the intervening defendants, and our resolution of the board's claims is dispositive of the claims of the intervening defendants.

[2] Andrew Graff, the named plaintiff's husband, also was a plaintiff at the commencement of this appeal, but subsequently withdrew from the case. Hereafter, references in this opinion to the plaintiff are to Nicole S. Graff.

substantive change to the town regulations; and (3) improperly substituted its judgment for that of the board when it rejected the board's determination that the keeping of in excess of four pet dogs was not a permissible use of property in the town's rural residential district. We reverse the judgment of the trial court.

On April 27, 2001, the Killingworth planning and zoning commission (commission) issued a cease and desist order to the plaintiff. The order informed the plaintiff that several complaints had been filed against her regarding the noise generated by the large number of dogs kept on her property, and also directed the plaintiff that she had thirty days either to reduce the number of dogs kept at her residence to no more than four, or to appeal the order to the board. The plaintiff appealed the cease and desist order to the board, which, after a de novo hearing, upheld the order, as well as the validity of the commission's original resolution that the keeping of more than four dogs was not a reasonable and customary accessory use of residential property in the town. The plaintiff appealed from the board's decision to the Superior Court, which sustained the plaintiff's appeal. This appeal followed.

The record reveals the following facts. The plaintiff owns a single-family home on a nine acre parcel of land located at 566 Route 148 in the town's rural residential district. In early 2001, Cathie Jefferson, the town zoning enforcement officer, as well as several other town officials, received multiple complaints from town residents, including the intervening defendants; see footnote 1 of this opinion; regarding the number of dogs on the plaintiff's premises and the noise generated by them. As a result of visits to the plaintiff's property, town officials observed as many as fourteen dogs on the premises. The plaintiff's neighbors, however, reported seeing up to twenty dogs on the property. Community complaints against the plaintiff's dogs centered on the

noise generated by prolonged barking at various hours of the day and night,[3] aggressive behavior toward a complainant and her family, as well as the fact that some of the plaintiff's dogs were found roaming unattended on the neighbors' property.

In response to the complaints from the plaintiff's neighbors and other members of the community, Jefferson sent a letter to Robert Bartner, the plaintiff's father, who was the record owner of the property at the time of the dispute, advising him of the complaints filed against the plaintiff and that she appeared to be operating a dog kennel on the property in violation of the town regulations. Jefferson also sent the plaintiff certified letters referencing the complaints received about the dogs, and that she believed the plaintiff was operating a commercial kennel. In her correspondence, Jefferson further stated that the plaintiff had ten days to demonstrate her compliance with state and local regulations, and Jefferson issued a summons requiring the plaintiff to register all of her dogs with the town clerk. The plaintiff responded to Jefferson's allegations in writing by way of two letters in which she stated that the dogs on her property were her pets and that she had never operated a commercial boarding or breeding kennel on the premises. Additionally, the plaintiff stated that, although she was under no obligation to inform the town when she either obtained or lost a pet dog, she had obtained licenses for three of her pets and agreed to update the town records regarding the status of the other pets on her property.

---

[3] The record reflects that the plaintiff took steps to minimize the noise coming from her property, including having four of her dogs surgically debarked and installing opaque nylon on the 600 feet chain link fence surrounding her property. The plaintiff's neighbors found these steps to be ineffective, prompting further complaints noting that any variation in the barking simply seemed to be related to how many dogs the plaintiff allowed outside on her premises, not as to whether they were visible through the fence.

Subsequent to this correspondence, Jefferson researched the dog registration records of the town in order to determine the customary number of dog licenses per residential property in the town.[4] Within the subset of residential properties maintaining more than one licensed dog on the premises, Jefferson discovered that there were 195 residences with two dogs, forty-three residences with three dogs, seven residences with four dogs, three residences with five dogs, one residence with seven dogs, and one residence, the plaintiff's, with fourteen dogs. This information was presented to the commission at its regular meeting on April 17, 2001, at which point Jefferson requested assistance in interpreting certain portions of the town regulations. The commission also received an opinion from the town counsel endorsing Jefferson's methodology, and concluding that fourteen dogs on a residential lot was not customary and was a violation of the accessory use provision of the town regulations. Following discus-

[4] The methodology utilized by Jefferson in her research was similar to that accepted by the trial court in *Sherman* v. *Zoning Board of Appeals*, Superior Court, judicial district of Middlesex, Docket No. CV95-0075462S (April 1, 1996) (16 Conn. L. Rptr. 395), which involved facts similar to the present case. Specifically, in *Sherman*, the plaintiffs appealed a decision of the Westbrook zoning board of appeals affirming the position of the town's former zoning enforcement officer that prohibited them from keeping in excess of three dogs on their premises. Id. The appeal was dismissed based on research conducted by the zoning commission's attorney, who had examined the dog licenses of the townspeople and determined that three was the maximum number of dogs licensed by any other resident of the town. Id. The trial court reasoned that the zoning commission was entitled to rely on the research and advice provided by the town counsel, and that "there [was] no evidence in the record that it has 'commonly, habitually and by long practice' been the custom of landowners in the neighborhood to own in excess of three dogs. The evidence is to the contrary." Id., 396–97. Consequently, the trial court in *Sherman* concluded that having in excess of three dogs on a residential property was not a permitted accessory use in the town of Westbrook. Id., 397. Drawing on precedent from this court, the trial court in *Sherman* also noted that the determination of an acceptable accessory use " 'is one peculiarly within the knowledge of the local board.' " Id., 396, quoting *Lawrence* v. *Zoning Board of Appeals*, 158 Conn. 509, 514, 264 A.2d 552 (1969).

sion and review of Jefferson's data, as well as the opinion of the town counsel, the commission voted in favor of a resolution that the keeping of four dogs or less in any household constituted a permissible accessory use of residential property. Conversely, the commission determined that any homeowner keeping more than four dogs would be in violation of the town regulations.

In accordance with the resolution passed by the commission on April 17, 2001, Jefferson issued a cease and desist order to the plaintiff on April 27, 2001, stating that there were fourteen licensed dogs residing on the plaintiff's property, and ordering the plaintiff to remove all dogs in excess of four from her property to bring it into compliance with the town regulations. In this order, Jefferson explained that " '[a]t the April 17, 2001 [commission] meeting there was discussion regarding the keeping of dogs as an accessory use. The [c]ommission reviewed the information gathered from the [t]own [c]lerk's office regarding dog licensing and decided that any household housing more than four dogs [was] in violation of the [town regulations]." At this point, Jefferson further instructed the plaintiff that she had thirty days either to remove all dogs in excess of four from her property, or to appeal the cease and desist order to the board. The plaintiff appealed the order to the board, which rejected her appeal. Additional facts and procedural history will be set forth as necessary.

I

It is useful to begin with a brief discussion of the reasoning of the trial court. Upon reviewing the relevant statutory language, the trial court concluded that § 61A.1 (G) of the town regulations, governing principal uses of land in the town, was "inapplicable to household pets, such as dogs, because the keeping of household pets does not constitute a general principal use in the rural residential district." The trial court also concluded

that the keeping of household pets, having been exempted by the language regarding principal uses, was also not regulated as an accessory use. Finally, the trial court concluded that the commission's resolution limiting the number of dogs as an accessory use was invalid because it was in effect the promulgation of a zoning regulation, which required prior notice and public hearing.

The board first claims that the number of household pets, including dogs, falls into the category of accessory uses subject to limitation under the town regulations. The plaintiff claims, to the contrary, that the number of household pets, including dogs, is exempted entirely from the scope of the regulations, and that the keeping of dogs as household pets is not even a use of land at all, much less an accessory use of land, but rather a property owner's private matter, so long as the dogs are not injurious to other property owners, such as by constituting a nuisance or causing unreasonable noise. We agree with the board.

Resolution of this issue requires us to review the relevant town regulations. Because the interpretation of the regulations presents a question of law, our review is plenary. See *Wood* v. *Zoning Board of Appeals*, 258 Conn. 691, 699, 784 A.2d 354 (2001). Additionally, "zoning regulations are local legislative enactments . . . and, therefore, their interpretation is governed by the same principles that apply to the construction of statutes. . . . Moreover, regulations must be interpreted in accordance with the principle that a reasonable and rational result was intended . . . ." (Citations omitted.) Id. "The process of statutory interpretation involves the determination of the meaning of the statutory language [or in this case, the relevant zoning regulation] as applied to the facts of the case, including the question of whether the language does so apply." *School Administrators of Waterbury* v. *Waterbury Financial*

*Planning & Assistance Board,* 276 Conn. 355, 364, 885 A.2d 1219 (2005). In the present case,[5] that process requires us to examine the language of the regulation, as well as extratextual sources that provide guidance as to the regulation's scope, and the applicability of the regulation's exclusionary language to pet dogs as an accessory use.

Because zoning regulations are in derogation of common-law property rights, they must be strictly construed and not extended by implication. See *Schwartz* v. *Planning & Zoning Commission,* 208 Conn. 146, 153, 543 A.2d 1339 (1988). "Whenever possible, the language of zoning regulations will be construed so that no clause is deemed superfluous, void or insignificant. . . . The regulations must be interpreted so as to reconcile their provisions and make them operative so far as possible. . . . When more than one construction is possible, we adopt the one that renders the enactment effective and workable and reject any that might lead to unreasonable or bizarre results." (Citations omitted.) *Planning & Zoning Commission* v. *Gilbert,* 208 Conn. 696, 705–706, 546 A.2d 823 (1988).

We first note that the town regulations are permissive in nature, meaning that those matters not specifically permitted are prohibited. See id., 708; *Bradley* v. *Zoning Board of Appeals,* 165 Conn. 389, 394, 334 A.2d 914

[5] We are mindful of the fact that General Statutes § 1-2z requires that, before we go beyond the text of a statute to determine its meaning, we first must determine that it is not plain and unambiguous. See *Bell Atlantic NYNEX Mobile, Inc.* v. *Commissioner of Revenue Services,* 273 Conn. 240, 250–51 n.13, 869 A.2d 611 (2005). Although the plaintiff contends that the clear and unambiguous language of the town regulations exclude household pets from all of the conditions or limitations placed on the keeping of animals within the town, we disagree. To the contrary, we conclude that the applicable language of the regulation is not plain and unambiguous as it relates to the question of whether household pets were meant to be regulated as an accessory use to residential property. Consequently, the present case does not implicate the limitation imposed upon our statutory review by § 1-2z, and we are free to consult extratextual sources when interpreting the relevant regulation.

(1973). Specifically, § 40A of the regulations provides: "Except as expressly and specifically permitted by these regulations, no land or improvements thereon within the Town shall be used for any purpose." As compared to prohibitive zoning ordinances, where all uses are allowed except those expressly prohibited, permissive zoning regulations are the preference of the majority of the municipalities in Connecticut. See R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (2d Ed. 1999) § 4.10, p. 63.

Section 61 of the regulations contains the language relevant to permissible principal and accessory uses in the rural residential district where the plaintiff's property is located.[6] Section 61A.1 sets forth the "General

---

[6] Section 61 of the Killingworth zoning regulations provides in relevant part: "61A. Uses Permitted

"In a Rural Residence District, there shall be permitted:

"61A.1. General Principal Uses

"The following *principal uses* and buildings:

"(A) One-family dwellings;

"(B) Two-family dwellings;

"(C) Customary Home Occupations subject to the following conditions . . .

"(D) Agriculture and farming including cultivation of soil, vegetable and nursery gardening, raising or harvesting any agricultural or horticultural commodity, dairying, harvesting of maple sugar, and the raising of crops, fruits and livestock including horses, cattle, sheep, goats, bees, and poultry. The foregoing provision shall not permit the keeping for commercial purposes of swine or fur bearing animals other than rabbits. . . .

"(G) Animals. The keeping of animals *other than household pets* shall be permitted subject to the following conditions and limitations. All animals shall be kept in such a manner so as not to create a public health hazard or have an adverse effect on the environmental quality of the surrounding area and community in general. Manure and other excrement piles shall be located and maintained so as to prevent runoff of manure and other polluting materials onto adjacent properties, roads, wells, or watercourses. Adequate fencing and structures shall be installed and maintained so as to confine all animals within the premises of the owner. The keeping of animals shall conform to all applicable regulations of The Connecticut State Department of Health Public Health Code, The Department of Environmental Protection, The State Department of Agriculture, and the General Statutes.

"Poultry and Rabbits. Not more than 100 such animals may be kept on any premises at any one time.

Principal Uses" permitted in the town. More specifically, § 61A.1 (G) sets forth the principal permitted uses regarding animals, providing in relevant part: "Animals. The keeping of animals *other than household pets* shall

"Swine. The keeping of swine for personal use is permitted providing that no more than three mature pigs, ten weeks or older, and no more than one litter consisting of suckling pigs, ten weeks of age or less are kept.

"Certain other Animals. The keeping of horses, ponies, burros, donkeys, llamas, sheep, goats and cattle is permitted providing that no more than three such animals are kept on a lot of not less than two acres. Three additional animals are permitted for each acre in addition to two acres. Any barn or shelter for such animals shall be located not less than fifty (50) feet from any property line. . . .

"61A.2. Special Principal Uses

"The following principal uses and buildings only when specifically authorized in the particular instance by a special exception granted by the Commission subject to the conditions prescribed in or pursuant to Section 130 . . .

"(I) Dog kennels for commercial purposes and boarding provided dogs are kept on a lot of not less than seven acres. Dogs shall be kept in buildings, enclosures, or runs located not less than 500 feet from any dwelling other than a dwelling on the lot of such use and not less than 300 feet from any property line. Dogs shall be maintained in such a manner so as not to cause a nuisance by reason of roaming at large, vicious disposition, excessive barking, or other disturbance. . . .

"61A.3. Accessory Uses

"Any accessory use or improvement but not including:

"(A) Signs.

"Any sign unless it conforms to the requirement prescribed therefor in these Regulations;

"(B) Vehicles; Residence Uses.

"The parking or storage of any commercial motor vehicle accessory to a use described in 61A.1(A) or 61A.1.(B) unless: (1) the number thereof does not exceed two, (2) such vehicle is regularly used for transportation, (3) such vehicle does not exceed two tons capacity, (4) such vehicle is used primarily for personal rather than business purposes and (5) such vehicle is usually parked or stored indoors;

"(C) Vehicles Other Uses.

"The parking or storage of any commercial motor vehicle accessory to a use described in 61A.1.(C) though (I) or in 61A.2. unless: (1) the number thereof does not exceed 5, (2) such vehicles are regularly used for transportation, (3) such vehicles do not exceed two tons capacity and (4) their location on the lot of the principal use is not less than 100 feet from any street line and 50 feet from any lot line;

"(D) Buildings.

"Any building used for residence purposes." (Emphasis added.)

be permitted subject to the following conditions and limitations. . . ." (Emphasis added.) Thus, animals "other than household pets" are permitted principal uses of property in the town. The term "household pet" is defined in § 20A of the town regulations as "any domesticated animal kept for pleasure rather than utility or profit which is normally kept within a residence and includes among others dogs, cats, gerbils, guinea pigs, hamsters, reptiles, birds, turtles, and tropical fish."

In addition, § 61A.3 permits "accessory uses" of property in the town's rural residential district. Section 20A of the town regulations define an accessory use as "any use, which is attendant, subordinate and customarily incidental to the principal use on the same lot."

The question raised by the board's claim is whether the exemption of "household pets," which includes pet dogs, from the category of principal uses of property in the town means, as the board contends, that the number of those animals is necessarily regulated by the accessory use category of the regulations, or as the plaintiff contends, is not regulated at all, except by the general provisions regarding nuisance and noise, which do not necessarily place a numerical limit on the keeping of such animals. We conclude that the number of dogs as household pets is regulated by the accessory use provision in the town regulations.

First, given the town's permissive zoning scheme, where all uses not specifically permitted are deemed prohibited, in order for the plaintiff to be entitled to have pet dogs on her property at all, there must be some language in the regulations *permitting* that activity. Household pets are specifically exempted from the principal use provision, and with the exception of the definition section, household pets are not otherwise mentioned in the regulations. This analysis would suggest, therefore, that because pet dogs are specifically

excluded as principal uses, and not specifically mentioned as accessory uses, they are not permitted at all.

Despite a lack of explicit language pertaining to pet dogs as accessory uses, however, it cannot be the case that the drafters of the town regulations intended to prohibit dogs altogether; and, indeed, the board has made no such claim. We come to this conclusion based on the rich tradition in the town, and the state as a whole, of citizens keeping dogs as pets,[7] as well as our requirement that when reading zoning regulations, "[t]he regulations must be interpreted so as to reconcile their provisions and make them operative so far as possible. . . . When more than one construction is possible, we adopt the one that renders the enactment effective and workable and reject any that might lead to unreasonable or bizarre results." (Citation omitted.) *Planning & Zoning Commission* v. *Gilbert,* supra, 208 Conn. 706. We therefore construe § 61A.3, the accessory use portion of the regulation, as both a mechanism for the town to permit individuals to keep dogs as pets under the town regulations, as well as to regulate what is an acceptable number of pet dogs that can be maintained at a single-family dwelling. To conclude otherwise would suggest that the plaintiff does not have any basis under the regulations for having any pet dogs at all.

Second, both our case law, and that of other jurisdictions, as well as the leading treatises on land use and

---

[7] In *Schwab* v. *Zoning Board of Appeals,* 154 Conn. 479, 482, 226 A.2d 506 (1967), we characterized this tradition as follows: "This court has had occasion, many times, to discuss the emergence of the dog, aided by statute, from its lowly common-law status as an animal considered to be base, inferior, and entitled to less regard and protection than property in other domestic animals . . . to its current status which accords the full recognition of property rights in dogs as in other domestic animals." (Citation omitted; internal quotation marks omitted.) Additionally, we noted that "countless people regard the dog as a faithful companion, a staunch guardian, and a family pet . . . ." Id., 482–83.

zoning, support this conclusion. These sources confirm that household pets traditionally have been treated as uses of land subject to zoning regulation as an accessory use.

The town's definition of accessory use in § 20A of the regulations as "any use, which is attendant, subordinate and customarily incidental to the principal use on the same lot," mimics the definition of accessory use found in *Lawrence* v. *Zoning Board of Appeals*, 158 Conn. 509, 511, 264 A.2d 552 (1969). In *Lawrence*, we specifically interpreted the meaning of the regulatory language "attendant," "subordinate," and "customarily incidental" when defining an accessory use. Id., 511–12. In particular, we held that "[t]he word 'incidental' as employed in a definition of 'accessory use' incorporates two concepts. It means that the use must not be the primary use of the property but rather one which is subordinate and minor in significance. . . . But 'incidental,' when used to define an accessory use, must also incorporate the concept of reasonable relationship with the primary use. It is not enough that the use be subordinate; it must also be attendant or concomitant." Id., 512.

Additionally, with respect to the word " 'customarily,' " we concluded that "[a]lthough it is used in this and many other ordinances as a modifier of 'incidental,' it should be applied as a separate and distinct test." Id. Moreover, in *Lawrence*, we noted that "[i]n examining the use in question, it is not enough to determine that it is incidental in the two meanings of that word as discussed [previously]. The use must be further scrutinized to determine whether it has commonly, habitually and by long practice been established as reasonably associated with the primary use. . . . As for the actual incidence of similar uses on other properties . . . *the use should be more than unique or rare*," although it need not necessarily be found on a majority of similarly

situated properties to be considered customary. (Citation omitted; emphasis added.) Id., 512–13.[8] We concluded, based on this interpretation of the regulatory language at issue, that the North Branford zoning board of appeals had correctly determined that twenty-six chickens and two goats were not permitted accessory uses to residential property in that town. Id., 514.

Prior to our clarifications regarding the definition of an accessory use as outlined previously, in *Schwab* v. *Zoning Board of Appeals*, 154 Conn. 479, 480–81, 226 A.2d 506 (1967), we concluded that dogs were a proper subject of zoning regulations, and we recognized the difference between a dog as a pet and a collection of dogs as a use of property. Specifically, in *Schwab* we noted that six dogs kept solely for recreational purposes were not permitted pursuant to the Darien zoning regulations as either a principal use or an accessory use of land. Id., 481–82. We stated that "[i]t is immaterial . . . whether the word 'kennel' means a collection of dogs or the quarters in which they are housed." Id., 482. "[N]othing in . . . the Darien zoning regulations permits the maintenance of a kennel in [a residential] zone. Hence that use, on the plaintiff's property, is prohibited." Id., 483.

Furthermore, in *Hume* v. *Building Inspector*, 355 Mass. 179, 181, 243 N.E.2d 189 (1969), the Massachusetts Supreme Judicial Court also addressed the issue of whether the keeping of multiple dogs was a valid accessory use to a residence. Although not binding, we

---

[8] In *Lawrence*, we also noted with approval that "[i]n situations where there is no . . . specific provision in the ordinance, the question is the extent to which the principal use as a matter of custom, carries with it an incidental use so that as a matter of law, in the absence of a complete prohibition of the claimed incidental use in the ordinance, it will be deemed that the legislative intent was to include it." (Internal quotation marks omitted.) *Lawrence* v. *Zoning Board of Appeals*, supra, 158 Conn. 513, quoting 2 A. Rathkopf & D. Rathkopf, Law of Zoning and Planning (2005) § 33:2, p. 33-6.

find the court's analysis in *Hume* to be persuasive. In *Hume*, the defendant owner of a residential property maintained ten dogs for "non-commercial, personal purposes . . . ." Id. The zoning regulation in question permitted, among other things, single-family dwellings and "[a]ccessory uses of the same lot [which are] customarily incident to any of the [enumerated] permitted uses and not detrimental to a residential neighborhood." Id., 180 n.1. The trial court interpreted the regulation as allowing as "an accessory use of residential property the keeping of three or more dogs for non-commercial, personal purposes," and concluded that the abutting plaintiff's remedy, if any, would be in nuisance. (Internal quotation marks omitted.) Id., 181.

The Massachusetts Supreme Judicial Court reversed the trial court, noting both that the town's zoning regulations were applicable to the defendant's maintenance of dogs on his property, and that a noncommercial kennel for a substantial number of dogs did not constitute a permissible accessory or incidental use of residential land. Id., 182. Specifically, the court concluded that the regulation "allows as accessory uses essentially only inoffensive, quiet uses of a type 'customarily incident to' an expressly permitted use." Id. In addition to *Hume*, several other courts similarly have concluded that dogs and other household pets are uses of land regulated by zoning,[9] and that in certain circumstances

[9] See, e.g., *Hodges* v. *Marion County*, 730 So. 2d 786, 787 (Fla. App. 1999) (court and municipality confirm that having pets, including raising and maintaining of birds as hobby, was valid accessory use of residential property); *Colts Run Civic Assn.* v. *Zoning Board of Adjustment*, 315 N.J. Super. 240, 250, 717 A.2d 456 (1998) (although zoning ordinance neither expressly permitted nor expressly prohibited proposed accessory use, maintenance of racing pigeons and pigeon coop as hobby activity deemed permitted accessory use to residential and agricultural property due to history of activity in jurisdiction, "implied nature of accessory uses and the impracticality of defining in advance every permissible accessory use" [internal quotation marks omitted]); *Beatrice* v. *Goodenkauf*, 219 Neb. 756, 759, 366 N.W.2d 411 (1985) (permissibility of boarding up to 120 dogs on property governed by interpretation of town zoning ordinance as it related to acceptable acces-

the number of animals may rise to such a number that they can no longer reasonably be deemed a valid accessory use of land.[10]

Similarly, secondary sources on land use and zoning support the conclusion that household pets such as dogs are subject to regulation as an accessory use. "Obviously, pets, such as dogs, cats, birds or fish, ordinarily or customarily kept at a dwelling would be considered allowed accessory uses in residential areas under accessory use provisions in zoning ordinances." 2 A. Rathkopf & D. Rathkopf, Law of Zoning and Planning (2005) § 33:16, pp. 33-31 through 33-32. "[A]nimals can be kept in a residence district as an accessory use, where the main use is residential. The keeping of a dog, horse, cow, or a reasonable number of hens under such circumstances is a customary accessory use." E. Bas-

---

sory uses of residential property); *DaPurificacao* v. *Zoning Board of Adjustment*, 377 N.J. Super. 436, 443, 873 A.2d 582 (2005) (housing of racing pigeons as hobby on property located in residential zone governed by accessory use provisions of town zoning regulations); *Tucker* v. *Zoning Board*, 148 N.C. App. 52, 53, 557 S.E.2d 631 (2001) (maintenance of ten to fifteen dogs in noncommercial kennel evaluated as accessory use to residentially zoned property); *Weber* v. *Board of Franklin County Commissioners*, 20 Kan. App. 2d 152, 158, 884 P.2d 1159 (1994) (raising and keeping of up to twenty-five greyhounds on land in rural residential and agricultural district subject to zoning authority of town); but see *Holcomb* v. *Denver*, 199 Colo. 251, 260, 606 P.2d 858 (1980) (court concluded that given specificity with which municipality had addressed problems associated with presence of dogs in residential area, city had not delegated to zoning administrator authority to regulate number of dogs that may be kept in residential district as accessory use).

[10] See, e.g., *Beatrice* v. *Goodenkauf*, 219 Neb. 756, 759, 366 N.W.2d 411 (1985) ("In this case the number of dogs is a major factor. Clearly, the keeping of a few dogs on a farm is an accessory use and is permitted, but caring for 120 dogs on a small piece of land is not a subordinate use or a recognized incidental use of land. The appellant's dog operation is clearly not an accessory use."); *DaPurificacao* v. *Zoning Board of Adjustment*, 377 N.J. Super. 436, 443, 873 A.2d 582 (2005) (court concluded that eighty-five pigeons and their accompanying pigeon coops could not be deemed accessory uses under town zoning regulations because factual record did not support argument that it was customary for Union Township residents to maintain large numbers of pigeons or pigeon coops on residential property).

sett, Zoning: The Laws, Administration, and Court Decisions During the First Twenty Years (1940) p. 103.

The plaintiff argues that, as household pets, dogs are not even a use of land at all and, therefore, are exempt from numerical limitations and other regulations imposed on animals whose primary shelter is not inside of a residence. The plaintiff's contention rests on a distinction between animals that spend a significant amount of time inside the single-family dwelling that is the primary use of the property, as opposed to animals exclusively maintained elsewhere on the property. We are not persuaded. First, such a characterization conflicts with the precedent previously cited applying a municipality's zoning regulations to household pets, including dogs.

Second, General Statutes § 8-2 (a) provides in relevant part: "The zoning commission of each city, town or borough is authorized to regulate . . . the location *and use of buildings, structures and land for trade, industry, residence or other purposes* . . . ." (Emphasis added.) A town's zoning power, therefore, also extends to the use of a building, and is not merely limited to the use of land in a particular district. Thus, with respect to an accessory use analysis, it is irrelevant whether dogs as household pets primarily obtain their shelter from the dwelling that is the primary use of the property. Rather, the relevant question is whether the number of dogs maintained in the dwelling and on the property as a whole, in this case, fourteen, "is attendant, subordinate and customarily incidental to the principal use [a single-family dwelling] on the same lot." Killingworth Zoning Regs., § 20A.

Third, § 40A of the regulations provides: "Except as expressly and specifically permitted by these regulations, no land *or improvement thereon* within the Town shall be used for any purpose." (Emphasis added.) This

provision requires both that all uses of land, as well as the uses of the "improvements thereon" be specifically permitted by the town regulations. Even the keeping of dogs in a single-family dwelling on residential property, therefore, requires some basis in the town regulations in order to be deemed a permitted use.

Additionally, the plaintiff draws significance from the fact that, pursuant to § 61A.1 (G) of the regulations, limitations are specifically placed on the keeping of certain animals as a principal use, while household pets are not mentioned within the context of § 61A.3. It does not logically follow that, just because the town regulations classified the keeping of certain animals in specified quantities as permitted principal uses, unspecified animals, such as dogs, can no longer be regulated under the accessory use portion of the regulation. Indeed, such a characterization would produce the strange result that by specifically authorizing and regulating certain animals, the town regulations lose control over all other animals, thus providing no specific written authority for the keeping of dogs and other household pets on a residential property, and directly conflicting with the town's permissive zoning scheme. Moreover, if the plaintiff's approach were accepted, there would essentially be no limit to the number of dogs and other household pets that could be kept on a residential property in the town, whether it be 100 dogs, 1000 gerbils, or 2000 turtles. In sum, we conclude that the more sensible and reasonable interpretation of the regulations, one that gives meaning to all of its sections, remains true to the town's permissive zoning scheme, and does not render the accessory use language superfluous, is that dogs are, and always have been, permitted as an accessory use to the extent that they remain "attendant, subordinate and customarily incidental to the principal use on the same lot." Killingworth Zoning Regs., § 20A.

Finally, the plaintiff notes that § 61A.3 of the town regulations contains an express list of potential accessory uses that are prohibited in the rural residential district, and contends that, having expressly addressed prohibited accessory uses, if the town had wanted to classify dogs as an accessory use of land and limit their number, it would have done so in that section. We are not persuaded. The plaintiff's argument misconstrues the nature of a permissive zoning scheme and an accessory use provision in a zoning regulation. The mere fact that certain accessory uses are excluded does not imply that all possible accessory uses must be enumerated. Furthermore, we note that, not only are dogs not listed as a valid accessory use, but neither are any other potential activities or uses, thus further suggesting that the provision is meant to be open to interpretation based on its general definition, rather than requiring a comprehensive list of acceptable accessory uses. To conclude otherwise, in the absence of such a list contained in the regulation, would render § 61A.3 largely meaningless because the commission would have no way to give the accessory use definition practical meaning based on the particular facts before it.

II

The board next contends that the trial court improperly concluded that the commission's advice to the town zoning enforcement officer was a legislative action to amend the town regulations requiring a separate notice and hearing, rather than merely an interpretation of an existing regulation. The plaintiff argues that the trial court properly concluded that the commission had implemented a zoning amendment that established a new substantive rule of general applicability requiring compliance with General Statutes § 8-3.[11] We agree with the board.

---

[11] General Statutes § 8-3 provides in relevant part: "(a) Such zoning commission shall provide for the manner in which regulations under section 8-2 or 8-2j and the boundaries of zoning districts shall be respectively estab-

Whether the commission's resolution was an interpretation of an existing regulation or an amendment requiring separate notice and hearing is a question of law because it calls for a determination of the legal significance of the resolution. Consequently, our review is plenary. See *Wood* v. *Zoning Board of Appeals*, supra, 258 Conn. 699.

The trial court determined that the commission intended for its resolution to be enforceable by the town zoning enforcement officer, that the applicability of the resolution to all residents who own pet dogs is "of great concern," and that the resolution's scope has "far-reaching implications for many individuals and their pet dogs in [the town]." The trial court also noted that "[t]he commission's substantive change in the accessory use regulations . . . was essentially an amendment," and that "[b]y setting a new, enforceable limit on the number of dogs each residence may own without violating the zoning regulations *where there was no limit previously*, the [commission] enacted a substantive change to the town's zoning regulations." (Emphasis added.)

The trial court's conclusion that the commission must have either amended or adopted new regulations requiring a process of notice and hearing is predicated on the assumption that domestic animals were previously exempt from the town regulations in their entirety, and

lished or changed. No such regulation or boundary shall become effective or be established or changed until after a public hearing in relation thereto, held by a majority of the members of the zoning commission or a committee thereof appointed for that purpose consisting of at least five members. . . .

"(d) Zoning regulations or boundaries or changes therein shall become effective at such time as is fixed by the zoning commission, provided a copy of such regulation, boundary or change shall be filed in the office of the town, city or borough clerk, as the case may be . . . and notice of the decision of such commission shall have been published in a newspaper having a substantial circulation in the municipality before such effective date. . . ."

that accessory uses must be specifically enumerated in order for them to be deemed valid. For all of the reasons stated in part I of this opinion, this assumption was a misapplication of the law. To the contrary, we conclude that household pets, including dogs, have always fallen within the scope of the town regulations, and that, although not previously interpreted in the town, the accessory use provision has always placed some limit on the number of pet dogs appropriate for a single-family dwelling. Both the trial court and the plaintiff have misconstrued this process of interpretation of the preexisting regulatory standard as a legislative act.

The preexisting accessory use regulation encompassed the rights and obligations regarding those uses of land that are not otherwise expressly provided for in the regulations, but are still "attendant, subordinate and customarily incidental to the principal use . . . ." Killingworth Zoning Regs., § 20A. To this end, the resolution adopted by the commission at its April 17, 2001 meeting was made in reference to the accessory use regulation found in § 61A.3, and merely acted as an advisory opinion on the application of the accessory use standard to a particular subject.[12] This procedure is wholly consistent with our analysis in *Lawrence* v. *Zoning Board of Appeals*, supra, 158 Conn. 513, where we noted that "[i]n light of the analysis . . . of what is meant by accessory use, it can be seen that the application of the concept to a particular situation may often

---

[12] The fact that the commission's guidance was in the form of a resolution does not necessarily imply that it was a legislative act. As a public board composed of individual members, the commission must act as a group in public with a written record. The passing of the resolution, therefore, was a mechanism utilized by the commission to express its collective interpretation of the limits placed on residents by the accessory use language. General Statutes § 1-225 (a) provides in relevant part: "The meetings of all public agencies, except executive sessions, as defined in subdivision (6) of section 1-200, shall be open to the public. The votes of each member of any such public agency upon any issue before such public agency shall be reduced to writing . . . and shall also be recorded in the minutes of the session at which taken . . . ."

present and depend upon questions of fact, or involve or be open to a legal exercise of discretion by the administrative officials and the board of appeals." (Internal quotation marks omitted.) In short, when a question arises as to whether a particular use is permitted as an accessory use, there necessarily must be a determination of whether, and to what extent, the identified use is considered "customary" and "incidental." The fact that this determination was made with the assistance of interpretive guidance from the body that promulgated the regulations does not turn the determination into a legislative act.

Given that pet dogs fall within the scope of the town regulations, it follows that the commission was in fact merely interpreting the definition of accessory use pursuant to a request from the agent responsible for enforcing the ordinance.[13] First, it is well established that a zoning commission has reasonable discretion in applying and interpreting its regulations. See *Kosinski* v. *Lawlor*, 177 Conn. 420, 423, 418 A.2d 66 (1979); *RK Development Corp.* v. *Norwalk*, 156 Conn. 369, 376, 242 A.2d 781 (1968); R. Fuller, 9A Connecticut Practice Series: Land Use Law and Practice (2d Ed.1999) § 34.13, p. 207. In this regard, the transcript of the commission meeting reflects that the commission members viewed their actions as interpretative, rather than legislative or as indicative of a new substantive regulation within the town.[14] Additionally, the board correctly notes that a

---

[13] Section 150A. of the Killingworth zoning regulations provides: "These Regulations shall be enforced by the Zoning Enforcement Officer who shall be appointed by and serve at the pleasure of the Zoning Commission. In the absence or during the incapacity of the person so appointed, the Chairman of the Zoning Commission may act as, and shall have all of the powers and duties of, the Zoning Enforcement Officer."

[14] The commission's discussion of how the town's accessory use provision relates to the dogs on the plaintiff's property reflects the following statements:

"Lou Annino: First of all this is not something that has to be written into anything. We are simply clarifying the regulations . . . and regardless of how we write this thing . . . .

zoning enforcement officer is not limited in the manner in which she decides to make a determination to issue a cease and desist order. It was perfectly acceptable, therefore, for Jefferson to do what she did in this case, which was to seek expert advice from legal counsel and consult with the commission in order to determine the meaning of the accessory use regulation promulgated as part of the legislative process.

## III

The board next contends that the trial court improperly substituted its judgment for that of the board when it rejected the board's determination that the number of pet dogs as an accessory use in the town's rural residential district should not exceed four in number. Conversely, the plaintiff argues that the trial court correctly concluded that, in light of the fact that the town regulations are generous with respect to allowing a large number of certain types of animals as a primary use of the property, the keeping of more than four dogs must be reasonably customary and incidental to a single-family dwelling. We agree with the board.

First, we note the scope of review of a decision by a zoning board of appeals. "[Zoning] boards of appeal are necessarily entrusted with the function of deciding, within prescribed limits and consistent with the exercise of a legal discretion, whether a regulation applies to a given situation, and the manner of its application."

"John Speicher: It's not a regulation.

"Lou Annino: We're giving [the zoning enforcement officer] some direction. I mean I don't think there's anything wrong with saying that . . . anybody with more than [four] dogs is in violation of our Zoning Regulations.

"Chairman [Charles] Martens: Yes I don't see anything wrong . . . .

"Frank Cunningham: Is that what we said originally? What did we say originally?

"Lou Annino: We're not writing it into a regulation where it's got to be . . . .

"Peter Ruopp: It's a guideline right?

"Chairman Martens: Yes."

*Connecticut Sand & Stone Corp.* v. *Zoning Board of Appeals*, 150 Conn. 439, 442, 190 A.2d 594 (1963). When evaluating the validity of a decision of a zoning board, we have also stated that "[t]he trial court [has] to decide whether the board correctly interpreted the [regulation] and applied it with reasonable discretion to the facts. . . . In applying the law to the facts of a particular case, the board is endowed with . . . liberal discretion, and its action is subject to review . . . only to determine whether it was unreasonable, arbitrary or illegal. . . . Moreover, the plaintiffs bear the burden of establishing that the board acted improperly." (Citations omitted; internal quotation marks omitted.) *Wood* v. *Zoning Board of Appeals*, supra, 258 Conn. 697–98. Additionally, "[w]hether a particular use qualifies as an accessory use is ordinarily a question of fact for the zoning authority, to be determined by it with a liberal discretion." (Internal quotation marks omitted.) *Upjohn Co.* v. *Planning & Zoning Commission*, 224 Conn. 82, 89, 616 A.2d 786 (1992).

These principles also are found in our reasoning in *Lawrence*, as well as in a leading zoning and planning treatise. Specifically, in *Lawrence* v. *Zoning Board of Appeals*, supra, 158 Conn. 514, we noted that whether the raising of chicken and goats was an accessory use to property used for residential purposes "[was] peculiarly within the knowledge of the local board." Similarly, 2 A. Rathkopf & D. Rathkopf, supra, § 33:2, p. 33-8 provides: "Generally, courts will defer to a local board's interpretation of the ordinance governing accessory uses unless such ordinance or the interpretation of it, has no foundation in reason." (Internal quotation marks omitted.) "The extent to which [potential accessory uses] are additional to maintaining a place in which to live, eat, and sleep, are matters of local climate, customs, wealth, interests, and similar factors which vary, not only from

place to place, but from time to time." Id., § 33:4, p. 33-13.

The trial court concluded, however, that it would be "pure conjecture" to determine the number of dogs the residents of the town have customarily kept as pets based on the town's dog licensing list. Additionally, the trial court held that there was not substantial evidence in the record to support the board's conclusion that in excess of four dogs was not a permissible accessory use to a residential property. We conclude that, in reaching its decision, the trial court ignored the deferential standard to board determinations that was required, as well as the board's liberal discretion to make such determinations, and its unique understanding of what is customary in the town.

"[O]ur case law clearly requires the trial court, in appeals from planning and zoning authorities, to search the record to determine the basis for decisions made by those authorities. In *Parks* v. *Planning & Zoning Commission*, 178 Conn. 657, 661–62, 425 A.2d 100 (1979), we said that [t]he [planning and zoning] commission's failure to state on the record the reasons for its actions . . . renders appellate review more cumbersome, in that the trial court must search the entire record to find a basis for the commission's decision . . . . We further stated that [i]f *any* reason culled from the record demonstrates a real or reasonable relationship to the general welfare of the community, the decision of the commission must be upheld. . . . Id., 662–63. We have enunciated this duty of a trial court with respect to appeals from zoning boards in a long line of cases." (Emphasis in original; internal quotation marks omitted.) *Gagnon* v. *Inland Wetlands & Watercourses Commission*, 213 Conn. 604, 607–608, 569 A.2d 1094 (1990); see also *Stankiewicz* v. *Zoning Board of Appeals*, 211 Conn. 76, 77–78, 556 A.2d 1024 (1989).

Thus, the appropriate analysis was whether the record established that the board reasonably could have concluded that more than four dogs was not a permissible accessory use to a residential property. We conclude that the record was sufficient for that determination.

There was substantial evidence in the record to support the board's determination that the plaintiff's use of her property to keep fourteen dogs as household pets was both unique and rare. First, of all the properties in the town with more than one dog, only 2 percent of those residences maintained in excess of four dogs, and the plaintiff's property, with fourteen pet dogs, was a significant outlier. This data was presented to the board by Jefferson in some detail based on a review of the town's dog licensing records and in accordance with the methodology accepted by our courts in similar cases.[15] The board also heard testimony from several neighbors who were upset about the disruptive noise and intimidating behavior exhibited by the plaintiff's animals.

The minutes from the board's deliberation reflect that the board reviewed and weighed the evidence from the public hearing, and ultimately concluded that Jefferson "used the best means at her disposal to come up with a reasonable number [of dogs as an accessory use] based on the facts available to her." Additionally, the board noted that "there was enough in the current regulations to allow . . . Jefferson to do what she did," and that "the regulations are there so that this sort of thing doesn't occur." In particular, the minutes state: "[Eric] Auer noted the question here is whether [Jefferson] used the resources available to her in the right manner, and he felt she did. Chairman [Bruce] Dodson agreed." These statements demonstrate that the board reflected on the evidence provided by Jefferson, as well

[15] See footnote 4 of this opinion.

as the testimony of the plaintiff's neighbors when reaching its decision. In short, we conclude that, when viewed in its entirety, the evidence presented to the board provides a reasonable basis for it to have concluded that keeping more than four dogs is both unique and rare in the town, and therefore, not a permissible accessory use of the town's residential property.

Moreover, "the plaintiff bears the burden of establishing that the board acted improperly." *Wood* v. *Zoning Board of Appeals*, supra, 258 Conn. 698. The plaintiff did not present any evidence contesting Jefferson's findings as to the number of pet dogs typically found in the town's residential areas, and failed to suggest an alternate methodology to that employed by Jefferson to discern the number of pet dogs that are "customarily incidental" to a residential property in the town.

## IV

Finally, the plaintiff claims that the decision of the trial court should be affirmed on the alternate ground that the town regulation regarding permissible accessory uses of residential property is unconstitutionally vague. Specifically, the plaintiff contends that the definition of "accessory use" in the town regulations is not sufficiently specific, and as a result, the regulations failed to provide her with adequate notice that the accessory use provisions applied to household pets. We are not persuaded.

"As a threshold matter, it is necessary to discuss the applicable standard of review. A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to [her], the [plaintiff] therefore must . . . demonstrate beyond a reasonable doubt that [she] had inadequate notice of what was prohibited or that [she was] the victim of arbitrary

and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . *References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning.*"(Emphasis added; internal quotation marks omitted.) *Rocque* v. *Farricielli,* 269 Conn. 187, 204, 848 A.2d 1206 (2004).

We are also mindful that the previously mentioned framework is shared by several of our sister states, and that the standards have been applied within the context of constitutional challenges to similar accessory use ordinances. Specifically, in *Holcomb* v. *Denver,* 199 Colo. 251, 258, 606 P.2d 858 (1980), the court stated: "It should be emphasized that the ordinance must be viewed for constitutional purposes in the light of a common sense understanding of what single-family dwellings are customarily used for—what the ordinary man on the street would consider a one-family dwelling to be. . . . Common sense and personal knowledge of what [a residential] district is customarily and ordinarily used for, provides only the roughest of guidelines. We cannot say, however, that the ordinance does not provide sufficient guidelines for it to be constitutionally enforced." (Citations omitted; internal quotation marks omitted.) Similarly, the California Court of Appeals has summarized this approach as follows: "Given the broad but definable range of activity which is included within the use of property for a [single-family] residence it cannot be said that the activities incidental to the main-

tenance of a single-family residence need to be specified separately. In order for a statute to meet the certainty required under due process standards, it is not necessary that it furnish detailed plans and specifications of the acts of conduct prohibited. . . . Judicial pronouncements, the common law and common understanding supply the requisite certainty for residential use within the meaning of th[e] ordinance." (Citation omitted; internal quotation marks omitted.) *Sechrist* v. *Municipal Court*, 64 Cal. App. 3d 737, 748, 134 Cal. Rptr. 733 (1976).

The essence of the plaintiff's claim is that none of the terms in the definition of "accessory use," as set forth in § 20A of the town regulations, has been defined. As noted previously, an accessory use is defined in § 20A as "any use, which is attendant, subordinate and customarily incidental to the principal use on the same lot." The plaintiff contends that none of the language in the accessory use provision would have "led one to believe that it applied to household pets and established a limit of four dogs applicable to all properties in [the town]." The plaintiff further claims that if this accessory use provision was applicable to the keeping of dogs as household pets, then the regulation was void for vagueness as applied." We disagree.

The plaintiff's argument overlooks the extensive guidance, both from this court, as well as other jurisdictions and legal treatises, which clarify the meaning of the words used in the regulation's definition of accessory use. In particular, these sources make it sufficiently clear that it is not anticipated that accessory use provisions will enumerate every conceivable activity that is a permissible accessory use, and that household pets, including dogs, routinely have been construed as potentially limited by accessory use regulations. See, e.g., *Lawrence* v. *Zoning Board of Appeals*, supra, 158 Conn. 513; *Schwab* v. *Zoning Board of Appeals*, supra, 154

Conn. 480–81; *Hume* v. *Building Inspector*, supra, 355 Mass. 182; 2 A. Rathkopf & D. Rathkopf, supra, § 33:16, pp. 33-31 through 33-32; see also footnotes 9 and 10 of this opinion. Indeed, due to the impracticality associated with a zoning board drafting a list of activities meant to encompass all possible accessory uses to a residential property within a community, some lack of specificity is required in order to provide the flexibility necessary for future board interpretation.

Consequently, the chosen words of the town's accessory use definition, namely, "attendant," "subordinate," and "customarily incidental," have developed an easily ascertainable meaning both from our case law and the guidance offered by leading authorities on zoning and planning. Significantly, this meaning is based in large part on a commonsense assessment by the members of a particular municipality of what is an appropriate secondary use of a residential property in their community. In the present case, the plaintiff was just as capable of utilizing her common sense when reviewing the accessory use provisions of the town regulation as any other member of the general public. We conclude, therefore, that, especially when reviewed in context with the preexisting authority outlined previously in this opinion, the town regulations are not unconstitutionally vague, and provided the plaintiff with sufficient notice that household pets, including her fourteen dogs, could be regulated as an accessory use.

The judgment is reversed and the case is remanded to the trial court with direction to dismiss the plaintiff's appeal.

In this opinion SULLIVAN, C. J., and NORCOTT and PALMER, Js., concurred.

KATZ, J., concurring. I agree with the majority's conclusion that the trial court's judgment, reversing the

decision of the named defendant, the zoning board of appeals of the town of Killingworth (board), that upheld a cease and desist order requiring the plaintiff, Nicole S. Graff, to reduce the number of pet dogs on her property to four, must be reversed. I write separately, however, to address an important aspect of the plaintiff's claim of right to keep her fourteen dogs, which the majority does not address directly.

The principal thrust of the plaintiff's claim is that the board expressly has *exempted* household pets from its regulatory scheme and, therefore, the number of dogs the plaintiff may keep is limited only by the common law of nuisance or by municipal health and sanitation laws. As evidence of the board's intent to relinquish its authority over this matter, the plaintiff points to the following town zoning regulation, set forth under the category of "General Principal Uses," which provides in relevant part: "The keeping of animals *other than household pets* shall be permitted subject to the following conditions and limitations." (Emphasis added.) Killingworth Zoning Regs., § 61A.1 (G). The plaintiff's interpretation of the proviso excluding household pets as exempting such pets from zoning regulations altogether is untenable for several reasons.

By its nature and very definition under the regulatory scheme, the keeping of household pets cannot be deemed a "principal use" of the property.[1] See Kill-

---

[1] Although the Killingworth zoning regulations do not define "principal use," the prevalent meaning ascribed to that term in other jurisdictions, consistent with the definition set forth under the Killingworth zoning regulations for an "accessory use," is the dominant, main or primary use of the land. See *Worth* v. *Watson*, 233 Ill. App. 3d 974, 980, 599 N.E.2d 967 (1992) ("[p]rincipal use is defined by the ordinance as the main use of the property; it is not defined as a necessary use"); *Sherwood* v. *Kennebunkport*, 589 A.2d 453, 454 (Me. 1991) (" '[p]rincipal use' is defined by the Ordinance to mean '[t]he primary use to which the premises are devoted or for which the premises are arranged, designed or intended to be used' "); *Kowalski* v. *Lamar*, 25 Md. App. 493, 499, 334 A.2d 536 (1975) ("[a] principal use is defined under this section to be a 'main use of land, as distinguished from an accessory use' "); *Sun Co.* v. *Zoning Board of Adjustment*, 286 N.J. Super.

ingworth Zoning Regs., § 20A (defining "household pet" as "any domesticated animal kept for pleasure rather than utility or profit which is normally kept within a residence"). As that definition clearly indicates, the keeping of pets is subordinate to the principal use of property for a residential dwelling. See also *Kaeser* v. *Zoning Board of Appeals*, 218 Conn. 438, 443, 589 A.2d 1229 (1991) (concluding that household pet "connotes to us an animal reasonably capable of dwelling within a household, presumably under the same roof and living as a member of a family"); cf. Killingtworth Zoning Regs., § 61A.2 (I) (requiring commercial dog kennels to keep dogs in buildings, enclosures or runs located not less than 500 feet from dwellings).[2] Therefore, had the board intended to exempt household pets from regulation, it surely would not have provided such an exemption under the zoning regulations setting forth principal uses. Indeed, a logical explanation for including the proviso "other than household pets" in § 61A.1 (G) that

440, 444, 669 A.2d 833 (1996) (" '[P]rincipal use' means the primary or 'main use' of the property, which comports with the traditional and plain meaning of the term 'principal.' See Webster's Third New International Dictionary, Unabridged, 1802 [1971] [defining 'principal' as 'first,' 'chief,' or 'most important'] . . . ." [Citation omitted.]); *Sprint Spectrum, L.P.* v. *Zoning Hearing Board*, 823 A.2d 258, 261 (Pa. Commw. 2003) ("[p]rincipal use is defined by the Zoning Ordinance as a 'dominant use(s) or main use on a lot, as opposed to an accessory use' "); *Board of Supervisors* v. *Zoning Hearing Board*, 717 A.2d 1, 3 (Pa. Commw. 1998) (" '[p]rincipal use' is defined as the 'main use of land or structures, as distinguished from a secondary or accessory use' "); *Avon* v. *Oliver*, 253 Wis. 2d 647, 653, 644 N.W.2d 260 (App. 2002) ("[t]he ordinance defines a 'principal use' as a 'main or primary use of land . . . as distinguished from a conditional, subordinate or accessory use, as specified and permitted by the regulations of the district in which it is located' "); see also Killingworth Zoning Regs., § 20A (defining accessory use as "any use, which is attendant, subordinate and customarily incidental to the principal use on the same lot").

[2] Section 61A.2 (I) of the Killingworth zoning regulations authorizes maintaining a commercial dog kennel as a special principal use, subject to certain acreage and set back requirements. Section 20A of the Killingworth zoning regulations defines a commercial kennel as "the housing of one or more dogs overnight for a fee or the keeping of three or more dogs with the purpose of selling their progeny."

is consistent with its placement in the general principal use section of the regulations is simply to make clear that the board was intending to prescribe therein the conditions and limitations applicable to *only* those animals the keeping of which constitutes a principal use of the land.

In addition, the fundamental principal is uncontested that, barring some self-imposed limitation or one imposed by Killingworth, the board properly can regulate this matter.[3] Accordingly, if the board had intended to exempt pets from the regulatory scheme and thereby relinquish all control over that matter, one would expect a far clearer manifestation of such an intent. Indeed, because the zoning scheme is a permissive one; see Killingworth Zoning Regs., § 40A;[4] were we to give literal effect to the regulation providing that "[t]he keeping of animals other than household pets shall be permitted"; Killingworth Zoning Regs., § 61A.1 (G); by implication, the keeping of household pets would not be a permissible use of the property. For all the reasons discussed in the majority opinion, both the dominant practice nationally and common sense dictates that such a use must be permitted and therefore must be considered to be an accessory use of the property. Furthermore, the board uniquely is situated to interpret its own regu-

---

[3] Although the plaintiff points to the fact that Killingworth does not limit the number of dogs that may be licensed to support her proposition that there is no such limit, that fact also evidences that the town has not withdrawn authority from the defendant to set that limit. Cf. *Holcomb* v. *Denver*, 199 Colo. 251, 256–58, 606 P.2d 858 (1980) (concluding that, although defendant city constitutionally could enforce broad accessory use ordinance that did not refer expressly to dogs, fact that city had enacted numerous ordinances regulating possession and ownership of dogs evidenced that city had not delegated authority to zoning administrator to prescribe number of dogs that could be kept in residential district as accessory use).

[4] Section 40A of the Killingworth zoning regulations provides: "Except as expressly and specifically permitted by these regulations, no land or improvement thereon within the Town shall be used for any purpose."

lations as to what that use entails.[5] See *Lawrence* v. *Zoning Board of Appeals*, 158 Conn. 509, 514, 264 A.2d 552 (1969) ("[e]ven though the board was not acting in a legislative capacity as would a zoning commission in making a change of zone, nevertheless its determination of the applicability of the [accessory use] ordinance, as we have construed it, to [the plaintiff's] situation lay within its sound discretion"). Therefore, I agree with the majority opinion's conclusion that the keeping of dogs as household pets is limited by the requirements attendant to an accessory use and that the keeping of fourteen dogs is not customarily incidental to residential property.

As a related note on that point, I am mindful that the record indicates that, because the plaintiff took the position that the board could not regulate the number of dogs she kept, she did not suggest to the board an alternative method by which the Killingworth zoning officer could ascertain the number of dogs that are "customarily incidental" to residential property as an accessory use under § 20A of the Killingworth zoning regulations. As the party seeking to demonstrate that the board acted improperly in affirming the zoning offi-

---

[5] With respect to the plaintiff's claim that the four dog limit adopted by Killingworth in the planning and zoning commission's April, 2001 meeting was an action requiring notice and a public hearing to be valid, because the zoning regulations did not exempt household pets, this action did not result in a change to the regulations, but, rather, an interpretation of the accessory use regulation. See Killingworth Zoning Regs., § 20A. Although a change to the regulation would have been subject to the notice and hearing requirements, zoning commissions are not required to follow such procedural requirements when interpreting a regulation, unlike other agencies subject to the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. Compare General Statutes §§ 4-166 (13) (defining regulation under UAPA to encompass "each agency statement of general applicability . . . that implements, *interprets*, or prescribes law or policy" [emphasis added]) and 4-168 (setting forth notice requirements prior to adopting regulation) with General Statutes § 8-3 (imposing notice and hearing requirements for changing or establishing zoning regulations).

cer's cease and desist order, the plaintiff bore the burden of proving that keeping fourteen dogs as household pets was a valid accessory use of her property. See *Wood* v. *Zoning Board of Appeals*, 258 Conn. 691, 698, 784 A.2d 354 (2001). Evidence of such an alternative method would have been relevant not only to the board's ultimate decision that keeping fourteen dogs was not a valid accessory use, but also to its decision that the plaintiff must get rid of all but four dogs to comply with the zoning regulations. The sole evidence before the board, however, was the current licensing records relied on by the zoning officer. Those records reflected that, of 250 residents licensing more than one dog, only five residents had more than four dogs. In the absence of evidence that these records were not indicative of customary practice, I cannot conclude that the board's decision upholding the zoning officer's cease and desist order, based solely on the officer's examination of current licensing records, necessarily was arbitrary and capricious.

I question, however, whether the number of dogs presently licensed to Killingworth residents provides a sufficient basis for reaching a well founded conclusion as to the limits of that accessory use. Indeed, this court indicated in *Lawrence* v. *Zoning Board of Appeals*, supra, 158 Conn. 509, that the term "customarily" indicates a practice continued over a period of time. See id., 512–13 ("[t]he use must be further scrutinized to determine whether it has commonly, habitually and by long practice been established as reasonably associated with the primary use"). The picture presented to the board may have been markedly different had licensing records covering a longer period been considered.

Finally, I would like to underscore that, in light of express limitations in the zoning regulations on the number of animals—other than household pets—that could be kept, the absence of any such limitation on

household pets, the absence of any limit on dogs that may be kept as part of a commercial kennel and the absence of any limit on the number of dogs that may be licensed by Killingworth, it was not irrational for the plaintiff to conclude, when moving to a rural town like Killingworth and purchasing nine acres of land, that there was no prohibition on her keeping fourteen dogs. Indeed, the plaintiff reasonably could have concluded that such use would create far fewer noise and odor issues than that which would have ensued had she used her property to the full extent permitted as of right by keeping other animals as a principal use of the property.[6] When confronted with noise complaints from neighbors, the plaintiff took measures, although ultimately not adequate, to address those concerns, including the extraordinary measure of having several of her dogs surgically "debarked." Although the law dictates that, despite these actions, the plaintiff nonetheless may be compelled to relinquish the company of ten of her fourteen canine companions, it would seem to be a wiser and more compassionate course of action for Killingworth zoning authorities to provide a clearer indication of limits they intend to enforce with respect to household pets.

---

[6] The plaintiff would have been permitted, as of right, to devote her nine acre parcel of land to the keeping of the following animals: 100 chickens or rabbits; three mature swine and a litter of suckling pigs less than ten weeks old; and up to twenty-four donkeys, burros, sheep, goats, horses, ponies, llamas or cattle. See Killingworth Zoning Regs., § 61A.1 (G).