STATE OF CONNECTICUT *v.* JUDITH SCRUGGS
(SC 17587)

Borden, Palmer, Vertefeuille, Sullivan and Lavery, Js.

699

Argued April 18—officially released September 5, 2006

*G. Douglas Nash*, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom were *James Dinnan*, senior assistant state's

attorney, and, on the brief, *Michael Dearington*, state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, J. The defendant, Judith Scruggs, was convicted after a jury trial on one charge of risk of injury to a child in violation of General Statutes § 53-21 (a) (1).[1] After the jury rendered its verdict, the defendant filed a motion for judgment of acquittal. The trial court denied the motion, concluding that the jury reasonably could have found that, by maintaining a cluttered and unclean residence, the defendant wilfully had caused her son, Daniel Scruggs (Daniel), to be placed in a situation that was likely to injure his mental health. The defendant claims on appeal[2] that § 53-21 (a) (1) is unconstitutionally vague as applied to her conduct and that the trial court improperly concluded that there was sufficient evidence to sustain her conviction. We conclude that § 53-21 (a) (1) is unconstitutionally vague as applied to the defendant's conduct. Accordingly, we reverse the judgment of the trial court.

The jury reasonably could have found the following facts. In late 2001, the defendant was a single parent living in a three bedroom apartment with her two chil-

[1] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony for a violation of subdivision (1) . . . of this subsection . . . ."

The information in this case alleged that the defendant's conduct occurred between August 1, 2001, and January 2, 2002. Although § 53-21 has been amended since that time; see Public Acts 2002, No. 02-138; that amendment is not relevant to this appeal. For convenience, we refer to the current version of the statute.

[2] The defendant appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

dren, Kara Morris (Kara) and Daniel. Kara was seventeen and Daniel was twelve. The defendant worked approximately sixty hours a week at two jobs—one as a full-time employee of the school that Daniel attended, the other as a part-time employee at Wal-Mart. Daniel was bullied relentlessly at school and, from September through December, 2001, was absent on many days. He frequently exhibited poor hygiene and occasionally defecated in his pants. At home, he slept in his bedroom closet, where he kept knives and a homemade spear to protect himself. The state department of children and families (department) was aware of Daniel's problems, and had been working with the defendant to have him placed in a different school. At some point in late 2001, the department conducted an inspection of the defendant's apartment in connection with its investigation of Daniel's situation. On December 27, 2001, the department closed its file on Daniel. In the early morning hours of January 2, 2002, Daniel hanged himself in his bedroom closet. During the investigation into Daniel's death, Officer Michael Boothroyd and Detective Gary Brandl of the Meriden police department, Pamela Kudla, a crisis intervention specialist called in by the police to assist Daniel's family, and Ronald Chase, an investigator for the state medical examiner's office, entered the defendant's apartment. They observed that it was extremely cluttered and that it had an unpleasant odor.

Thereafter, the state filed a four count information in which it charged that the defendant: (1) "willfully or unlawfully caused or permitted a child under the age of sixteen years to be placed in such a situation that the life or limb of such a child was endangered . . . [by] providing a home living environment that was unhealthy and unsafe" in violation of § 53-21 (a) (1); (2) "willfully or unlawfully caused or permitted a child under the age of sixteen years to be placed in such a situation that the health of such child was likely to be

injured . . . [by] providing a home environment that was unhealthy and unsafe" in violation of § 53-21 (a) (1); (3) "willfully or unlawfully caused or permitted a child under the age of sixteen years to be placed in such a situation that the health of such child was likely to be injured . . . [by] failing to provide proper medical or psychological care for such child" in violation of § 53-21 (a) (1); and (4) "negligently deprived another person of proper physical care" in violation of General Statutes § 53-20.

At the close of the state's case, the defendant filed a motion for judgment of acquittal. The trial court granted the motion as to the first count because "[t]here [was] no evidence . . . to allow a jury to find as to any of the conditions charged in the home living environment that the defendant wilfully caused or permitted a situation that created a risk of physical injury to a [child]." The court denied the defendant's motion, however, as to counts two through four. The state then filed a substitute information in which it charged that the defendant: (1) "willfully or unlawfully caused or permitted a child under the age of sixteen years to be placed in such a situation that the health of such child was likely to be injured . . . [by] providing a home living environment that was unhealthy and unsafe" in violation of § 53-21 (a) (1); (2) "willfully or unlawfully caused or permitted a child under the age of sixteen years to be placed in such a situation that the health of such child was likely to be injured . . . [by] failing to provide proper medical or psychological care for such child" in violation of § 53-21 (a) (1); and (3) "negligently deprived another person of proper physical care" in violation of § 53-20. At the close of the evidence, the defendant renewed her motion for judgment of acquittal as to the remaining counts of the information, and the court reserved its decision until after the verdict.

The jury found the defendant guilty under the first count of the substitute information only. The defendant then filed a postverdict motion for judgment of acquittal. Addressing that motion and the previously deferred motion for judgment of acquittal, the trial court found that although there was no evidence to support a finding that the defendant's conduct was likely to cause injury to a child's physical health, the jury reasonably could have found that the conditions in the defendant's apartment were likely to cause injury to a child's mental health. The court then denied the motion for judgment of acquittal, relying on this court's decision in *State* v. *Payne*, 240 Conn. 766, 770, 776, 695 A.2d 525 (1997), overruled in part on other grounds, 269 Conn. 481, 490, 849 A.2d 760 (2004), which held that the risk of injury statute prohibits conduct that creates a situation that poses a risk to a child's mental health.

In its memorandum of decision denying the motion for judgment of acquittal on the first count, the trial court found the following facts. "The jury heard testimony from several officials who went to the defendant's home on January 2, 2002, after receiving reports of a suicide there. Police testified that they found the dead body of the defendant's twelve year old son, Daniel, lying on the floor of a walk-in closet in his bedroom. The defendant and her seventeen year old daughter, Kara . . . told the police that Daniel had hung himself. Somewhere in the closet near the body, police found three long kitchen-type knives and a sharp implement affixed to a pole in a spear-like device, but there was no evidence that any of these objects played a role in causing the death.

"The evidence, viewed most favorably to sustaining the verdict, would have reasonably permitted the jury to find that Daniel lived in a home with a foul and offensive odor. Four of the state's witnesses who went there on January 2 described the odor in various terms,

as follows. . . . Boothroyd testified that 'a definite' and 'a bit of offensive' odor 'permeated throughout the whole home.' . . . Brandl described the odor as 'very noticeable,' 'as if . . . you . . . stuck your head in a dirty clothes hamper . . . plus an odor of garbage' and said that although he noticed the odor upon entering the apartment, it was even stronger in the back of the house. . . . Kudla . . . testified that the home had a 'very foul' and 'really bad' odor, especially as one went farther inside. Although . . . Chase . . . described the odor as only 'slightly offensive' and said he became accustomed to it after being in the premises and various defense witnesses denied that the apartment smelled bad, the jury was not required to believe witnesses denying the existence of any odor or minimizing its pungency.

"The state's witnesses also described the apartment as very messy and cluttered. Boothroyd said the apartment was 'extremely messy and dirty, very cluttered' and had a 'chaotic atmosphere.' He said that 'it wasn't an easy place to walk through . . . . [Y]ou had to watch your step everywhere you went and [make] sure that you stayed on your feet' because of clothing and other articles piled everywhere on the floors throughout the house. He further testified that he saw dust accumulated on the top of various items. Brandl also said that the clutter made the apartment hard to walk through, with only an eighteen inch path between piles of debris from the front door to the kitchen. He said he could not even see the floor surface in Daniel's bedroom because of debris on the floor, some piled as high as the bed. When Brandl walked into the bedroom, he had to step on clothing and heard items cracking and breaking underneath. The police had to clear a path in the bedroom for the medical examiner's investigator to walk to the closet where Daniel's dead body lay. Kudla also testified that the home was very cluttered. She said

that articles were piled on the floors throughout the house and that it was hard to maneuver or walk without stepping on those items. She said that in the bathroom one had to walk on clothing and other articles on the floor to get to the toilet. Chase also described the house as 'extremely cluttered.'

"The jury could have found this testimony about the cluttered condition of the apartment from the state's witnesses during the prosecution's case-in-chief to be credible and persuasive. In addition, the jury saw photographs, introduced into evidence by both parties, that were taken of the interior of the apartment on the day of Daniel's death. The photographs showed that most floors in the apartment were covered with furniture, piles of clothing and other debris, plastic bins, plastic garbage bags, and other items. The [photographs] taken in the living room, the bedrooms of the defendant and her two children, and the bathroom show almost no clear floor space, the most notable exception being the narrow pathway described by some witnesses as leading from the front door. Clothing was strewn in layers on the floors of the three bedrooms. Flat surfaces above floor level—such as tabletops, chairs, and other furniture—were also covered with items, often with no room for any additional items. For example, atop an ironing board in the living room sat an iron, coffee cup, coffee can with Styrofoam cups atop it, pencil, cellophane tape, socks and other clothing, a book, a roll of paper, and other items. There was no clear surface in the kitchen to prepare or eat food. Many items on the kitchen and pantry counters, kitchen table, and stove had additional items inside or on top of them. The only horizontal surfaces above floor level that were free of debris in the photographs taken of the defendant's apartment on January 2, 2002, were the three beds belonging to the defendant and her two children.

"Photographs taken in the bathroom on the day that the defendant reported Daniel's death showed the floor there to be covered completely with clothing. One could not walk to the sink, bathtub or toilet without stepping on clothing. The clothes on the floor blocked the door leading from the bathroom to [Kara's] adjacent bedroom . . . from being closed. Clothing on the floor blocked the cabinet doors under the bathroom sink from being closed. Although [Kara] testified that she had placed the clothes on the bathroom floor earlier that day to sort the laundry, the jury was not required to believe her on this point."

The trial court rejected the defendant's claim that expert testimony was required to establish that the conditions in the apartment likely would result in injury to the mental health of a child. It found that "[t]he evidence in this case showed a child in severe distress—so distraught over bullying at school that he was defecating in his pants and missing school frequently and fearful at home. The evidence showed that he did not bathe often, smelled bad, had bad breath, problems probably compounded by fouling his pants at school. The jury could reasonably conclude that such a child needed to bathe more often and clean himself better. Yet the conditions of his home discouraged him from doing so. When bathing or using the toilet at home, he had no privacy because the door leading to his seventeen year old sister's bedroom could not be closed. The jury could certainly infer that the condition of the bathroom—clothing covering the floor, dirty and unsanitary fixtures, and articles in the tub—was a hindrance to using the bathroom, or at least would not encourage this twelve year old child with severe hygiene problems to clean himself there.

"Though a hard case, this was not a close case. . . . [Jurors'] own lives, their knowledge of human experience, and their common sense would . . . provide an

ample basis for them to assess the likely effect of the chaotic and filthy home environment in the defendant's household on the mental state of twelve year old Daniel . . . . The jury could use its everyday knowledge and common sense to conclude that the clutter and squalor throughout the home and lack of privacy in the bath were likely to harm Daniel's mental health, in light of his undisputedly fragile emotional state. Such a determination was not 'beyond the ken of the average juror.' "

The court concluded that "[a]ny layperson with common sense could conclude that the squalor and home living environment here created a risk to Daniel's emotional health. . . .

"There were few places where Daniel could walk without stepping on clothing or debris. [The] [b]athtub and toilet were filthy, and the bathroom provided no privacy for cleaning himself. He went to school smelling bad. The only refuge for this troubled child, beset by bullies at school and fearful at home, was a closet. Even there, he felt unsafe.

"This is not a case about a messy house. No law of which this court is aware regulates the frequency of vacuuming or prescribes specific housekeeping practices. The law, however, does seek to protect children . . . . The evidence here went far beyond messy or disorderly living conditions. The evidence showed extreme clutter and pervasive odor throughout the home, unsanitary bathroom facilities, and a child whose obvious emotional distress manifested itself in severe hygiene problems. It did not take an expert for this jury to conclude that the home living environment was likely to injure the mental, psychological, and emotional health of this troubled and fragile child." Accordingly, the trial court denied the defendant's motions for judgment of acquittal and rendered judgment in accordance with the verdict.

On appeal, the defendant claims that: (1) § 53-21 (a)
(1) is unconstitutionally vague as applied to her conduct
because the statute provides no notice that poor
housekeeping may be a criminal offense; and (2) the
evidence was insufficient to support the defendant's
conviction for risk of injury to a child under § 53-21 (a)
(1) because, without expert testimony, the jury had no
basis upon which to conclude that the conditions in
her apartment were likely to cause a mental health
injury to a child. We conclude that these claims are
inextricably intertwined. If a juror of ordinary experi-
ence and average intelligence could not have known,
without expert testimony, that the conditions in the
defendant's apartment were likely to injure the mental
health of a child, then the defendant could not have
known. Moreover, expert testimony as to whether the
conditions in the apartment were likely to cause injury
to the mental health of a child could not have estab-
lished that the defendant knew or should have known
of the likely consequences of those conditions. The
causal connection between conduct and an injury and
the foreseeability of an injury are distinct legal concepts
and require distinct types of proof.[3] Accordingly,

---

[3] For example, if expert testimony was required to show that combining
two ordinary household cleaning products created a toxic gas, but there
was no evidence that the defendant knew or should have known of that fact,
then the expert testimony would not establish the injury was foreseeable. We
do not suggest that expert testimony on causation is never helpful in risk
of injury cases. For example, in *State* v. *McClary*, 207 Conn. 233, 243, 247,
541 A.2d 96 (1988), the state presented expert testimony *both* that the victim's
injury was caused by violent shaking *and* that the force required to inflict
the injuries was so great that the defendant must have known he was hurting
the child. Moreover, although there is no requirement under § 53-21 (a) (1)
that the defendant know the *specific* harm that likely would result from his
conduct, expert testimony might be helpful on that issue. See *State* v. *Padua*,
273 Conn. 138, 157, 869 A.2d 192 (2005) (state was not required to prove
precise physiological effects on child of ingesting marijuana, but expert
testimony on that question might be helpful). We cannot perceive, however,
how expert testimony could establish that the defendant should have known
that the conditions in her apartment could cause mental injury to a child
and would be within the scope of § 53-21 (a) (1).

although we ordinarily do not reach constitutional claims if an appeal can be resolved on other grounds, we do so in this case because it would be misleading to suggest that the presentation of expert testimony on causation could cure a potential constitutional infirmity in the application of the statute to the defendant's conduct.

The defendant argues that § 53-21 (a) (1) is unconstitutionally vague as applied to her conduct because it does not require the state to prove that she had the intent to injure Daniel, or even that she had knowledge that the conditions in the apartment were likely to injure Daniel, but only that she had the general intent to engage in conduct creating a situation that was likely to have injured him. She further argues that, even if the statute includes a knowledge requirement, the statute is vague because she could not have known that her conduct violated the statute. We disagree with the defendant's first claim, but agree with her second claim.

"A statute . . . [that] forbids or requires conduct in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. . . . Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." (Citations omitted; internal quotation marks omitted.) *State* v. *Cavallo*, 200 Conn. 664, 667, 513 A.2d 646 (1986). "A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to [her], the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [she] had inadequate notice of what was prohibited or that [she was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the

right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning." (Internal quotation marks omitted.) *Graff* v. *Zoning Board of Appeals*, 277 Conn. 645, 672–73, 894 A.2d 285 (2006).

The defendant concedes that her constitutional claim was not preserved at trial, but argues that it is reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We may review an unpreserved claim under *Golding* if: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id. Because the record is adequate for review and the claim is of constitutional magnitude, the defendant's claim is reviewable.

We first address the defendant's claim that § 53-21 (a) (1) is unconstitutional as applied because it does not require the state to establish that she knew or should have known that her conduct likely would result in injury to a child. Section 53-21 (a) (1) provides in relevant part that "[a]ny person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that . . . the health of such child is likely to be injured . . . shall

be guilty of a class C felony . . . ." In support of her claim that this language does not contain a knowledge requirement, the defendant relies on this court's decision in *State* v. *McClary*, 207 Conn. 233, 239–40, 541 A.2d 96 (1988). In that case, the defendant was convicted under § 53-21 after his six month old daughter incurred injuries consistent with having been violently shaken. Id., 234–36. The defendant claimed on appeal that the trial court improperly had relied solely on expert medical testimony to establish the mental state required by the statute. Id., 244. Specifically, he argued that he could not have known that he was causing the child discomfort. Id. We concluded that "such knowledge or mental state is not an element of the crime required to establish guilt. For a conviction the trial court had to find proven beyond a reasonable doubt only that the defendant, by a volitional act, shook the child and caused the injury." Id. There was no claim in *McClary* that this general intent requirement rendered the statute unconstitutionally vague.

That constitutional claim was raised, however, in *State* v. *Torrice*, 20 Conn. App. 75, 80–81, 564 A.2d 330 (1988), cert. denied, 213 Conn. 809, 568 A.2d 794 (1989). In that case, the defendant was convicted of violating § 53-21 in connection with several incidents in which he had assaulted and verbally abused the three year old victim. Id., 78–79. On appeal to the Appellate Court, the defendant claimed that the trial court improperly had failed "to add the 'judicial gloss' that is necessary to prevent the statute from being unconstitutionally vague." Id., 80. The Appellate Court concluded that the trial court properly had instructed the jury that "it was not permitted to find the defendant guilty for committing 'any act,' but must find that he acted wilfully and 'that he either intended the resulting injury to the victim, or he knew that the injury would occur, or that his conduct was of such a character that it demonstrated

a reckless disregard of the consequences.' " Id., 81; see also *State* v. *Guitard*, 61 Conn. App. 531, 543, 765 A.2d 30 (applying *Torrice* standard), cert. denied, 255 Conn. 952, 770 A.2d 32 (2001); *State* v. *Cutro*, 37 Conn. App. 534, 539, 657 A.2d 239 (1995) (applying *Torrice* standard to situational portion of § 53-21); cf. *State* v. *Sorabella*, 277 Conn. 155, 173, 891 A.2d 897 (2006) ("the intent to do some act coupled with a reckless disregard of the consequences . . . of that act is sufficient to [establish] a violation of the statute" [internal quotation marks omitted]); *State* v. *Padua*, 273 Conn. 138, 161, 869 A.2d 192 (2005) (under § 53-21 [a] [1], "wilful misconduct is *intentional misconduct,* which is *conduct done purposefully and with knowledge of [its] likely consequences*" [emphasis in original; internal quotation marks omitted]).

We agree with the defendant that the intent requirement of § 53-21 (a) (1), which, on its face, requires the state to prove only that the defendant had the general intent to commit an act that was likely to injure the health of a child, would be unconstitutionally vague as applied to otherwise lawful conduct that no reasonable person could have known to have posed such a threat. Cf. *State* v. *Higgins*, 265 Conn. 35, 48, 826 A.2d 1126 (2003) (knowledge of victim's age not element of General Statutes § 53a-54b [8], under which murder of child under age of sixteen is capital felony, because "[t]he situation is not one where legitimate conduct becomes unlawful solely because of the identity of the [victim]" [internal quotation marks omitted]). We conclude, however, that the gloss placed on the statute by the Appellate Court in *Torrice* cures any such constitutional infirmity.[4]

---

[4] We note that the state argues that this court should apply the *Torrice* standard, thereby implicitly conceding that § 53-21 (a) (1) would be unconstitutional in the absence of the gloss placed on the statute by the Appellate Court in that case. The state also points out that the trial court instructed the jury in accordance with *Torrice* in the present case.

Accordingly, we must address the defendant's claim that the statute is unconstitutionally vague because it did not provide her with adequate notice of the line dividing lawful conduct from unlawful conduct in this context. This court previously has recognized that "[t]he general purpose of § 53-21 is to protect the physical and psychological well-being of children from the potentially harmful conduct of adults." *State* v. *Payne*, supra, 240 Conn. 771. "Our case law has interpreted § 53-21 [(a) (1)] as comprising two distinct parts and criminalizing two general types of behavior likely to injure physically or to impair the morals of a minor under sixteen years of age: (1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . and (2) acts directly perpetrated on the person of the minor and injurious to his moral or physical well-being. . . . Thus, the first part of § 53-21 [(a) (1)] prohibits the creation of situations detrimental to a child's welfare, while the second part proscribes injurious acts directly perpetrated on the child." (Citation omitted; internal quotation marks omitted.) *State* v. *Padua*, supra, 273 Conn. 147–48. The present matter involves the portion of § 53-21 (a) (1) relating to the creation of a situation likely to result in injury to the mental health of a child.

"Under the 'situation' portion of § 53-21 [(a) (1)], the state need not prove actual injury to the child. Instead, it must prove that the defendant wilfully created a situation that posed a risk to the child's health or morals. . . . The situation portion of § 53-21 [(a) (1)] encompasses the protection of the body as well as the safety and security of the environment in which the child exists, and for which the adult is responsible." (Citations omitted; internal quotation marks omitted.) Id., 148.

In *State* v. *Payne*, supra, 240 Conn. 776, this court determined for the first time that the term "health," as

used in the "health is likely to be injured" language of § 53-21, includes mental health as well as physical health. Cf. *State* v. *Schriver*, 207 Conn. 456, 458, 466–68, 542 A.2d 686 (1988) (term health as used in " 'likely to impair the health or morals' " portion of § 53-21 does not include mental health). In *Payne*, the defendant was convicted of engaging in conduct that likely would injure the mental health of a child after he forced three young boys to expose themselves and to urinate into a cup. *State* v. *Payne*, supra, 769. The defendant claimed that "neither the statutory language nor authoritative judicial gloss gave him sufficient notice that risk of injury to mental health is included within § 53-21 . . . ." Id., 776–77. We concluded that because "the common meaning and legal definition of health includes mental health, and precedents from other jurisdictions have recognized that health, when undefined by statute, includes mental health," a person of ordinary intelligence would know that § 53-21 applied to conduct posing a risk of injury to a child's mental health. Id., 778. We further concluded that the defendant "had fair warning that by requiring a child to expose himself for an unlawful purpose, he violated § 53-21" because the Appellate Court previously had held that forcing young children to undress fell within the scope of the statute. Id., 778–79, citing *State* v. *Palangio*, 24 Conn. App. 300, 305, 588 A.2d 644, cert. denied, 218 Conn. 911, 591 A.2d 813 (1991); see also *State* v. *Velez*, 17 Conn. App. 186, 199, 551 A.2d 421 (1988), cert. denied, 210 Conn. 810, 556 A.2d 610, cert. denied, 491 U.S. 906, 109 S. Ct. 3190, 105 L. Ed. 2d 698 (1989).

*Payne* is the only decision in which this court has addressed a challenge to a conviction under the mental health portion of § 53-21 (a) (1) on the ground that an ordinary person could not know what conduct is prohibited by the statute. We recently have considered a number of claims involving a related issue, however,

namely, whether the causal connection between the defendant's conduct and the risk of *physical* injury to a child was within the knowledge and experience of an ordinary *juror*. In *State* v. *Smith*, 273 Conn. 204, 206–207, 216, 869 A.2d 171 (2005), we considered, inter alia, whether expert testimony was necessary to establish the risk of injury to an infant who was found next to an aluminum foil packet containing six to seven adult doses worth of crack cocaine on a bed on which the defendant lay in a semiconscious state. We noted that "[o]ur state law reflects a legislative determination that cocaine is a dangerous drug, particularly when consumed by a young person" and that numerous statutes prohibited its possession, sale, transport, and the like. Id., 212–13. We further concluded that the harmful effects of orally ingesting cocaine were within the common knowledge of a typical juror because they had "been noted in numerous published opinions that have highlighted the threat to the health and safety of a person who hides cocaine in his mouth or swallows it in an attempt to evade discovery. . . . Moreover, the potentially deadly effects of orally ingesting crack cocaine have been the subject of published news reports." (Citations omitted; internal quotation marks omitted.) Id., 214–15. Accordingly, we concluded that expert testimony was not required. Id., 216.

Similarly, in *State* v. *Padua*, supra, 273 Conn. 146, we considered whether expert testimony was necessary to establish the risk of physical injury to young, unsupervised children present in an apartment where the defendants packaged marijuana for sale. We noted that "the Connecticut legislature has made the clear determination that marijuana is a dangerous substance from which children, especially, should be protected. . . . Moreover, although the most familiar method of consumption of the drug may be by smoking it, common knowledge, experience and common sense inform us

that the effects of the drug can also be experienced if it is ingested orally." (Citation omitted.) Id., 154–55. Specifically, we noted that "[p]opular television shows and movies have depicted individuals experiencing the effects of marijuana after eating the drug baked into brownies. Additionally, information concerning the oral consumption of marijuana has appeared in the news and on websites." Id., 155 n.25. We further noted that we could not "blink at the reality that, despite its illegality, because of its widespread use, many people know of the potential effects of marijuana, either through personal experience or through the experience of family members or friends. . . . The unfortunate prevalence of marijuana use, coupled with the substantial effort to educate all segments of the public regarding its dangers, underscores the reality that the likely effects of [consuming marijuana] are within the ken of the average juror." (Internal quotation marks omitted.) Id., 150–51. Thus, we held in *Padua* that expert testimony was not necessary to establish risk of injury to the children because "the detrimental effects of marijuana, regardless of the method used to introduce the drug into the body, are within the common knowledge of the average juror." Id., 152.

Before addressing the substance of the defendant's claim that § 53-21 (a) (1) does not provide adequate notice that her conduct was criminal, we must first address her claim that the trial court improperly applied a subjective standard in determining that the defendant should have known that the conditions in her apartment were likely to injure Daniel's mental health. Specifically, the defendant challenges the trial court's conclusion that Daniel's physical and mental frailty made the risk of injury to his mental health obvious. We agree with the defendant that the court should have applied an objective standard in determining whether the defen-

dant had notice that her conduct fell within the scope of § 53-21 (a) (1).

The following procedural history is relevant to this claim. As we have indicated, the defendant filed a motion for judgment of acquittal after the state rested its case. During arguments on that motion, the trial court inquired whether evidence of Daniel's behavior was relevant to the first two counts of the original information. The prosecutor responded that "[i]t does not matter with regards to the first two counts . . . ." Rather, it was the state's position that the conditions in the defendant's apartment environment would injure "[a]ny child."[5]

The trial court stated in its memorandum of decision that "neither the jury nor the court was required to find that such living conditions would be likely to injure the health of any child. The jury could reasonably consider

---

[5] The trial transcript contains the following colloquy:

"The Court: Does it matter to this case what [Daniel's] situation was, in terms of the first two counts?

"[The Prosecutor]: I'm not following, Your Honor.

"The Court: Okay. Your argument before was for a young man of these kinds, who had this kind of conduct, defecating, hygiene—

"[The Prosecutor]: It does not matter with regards to the first two counts, is my position.

"The Court: Does not matter?

"[The Prosecutor]: That's right.

"The Court: So if the child—

"[The Prosecutor]: Any child.

"The Court: Any child living in this kind of a cluttered situation would be a short hand for the entire array of evidence, the entire sum of evidence we've heard?

"[The Prosecutor]: Yes, that's my position. With regards to counts three and four going specifically to medical and/or psychological then I think that is particular to Daniel.

"The Court: So, the state's claim is that the condition of the house is likely to injure the, is a situation likely to injure life or limb, which is basically physical well-being, or likely to injure health, which is broadly construed as physical or mental health.

"[The Prosecutor]: Or mental health, yes, Your Honor."

evidence presented about the precarious emotional state of the specific child actually living in these conditions in determining whether the conditions were likely to injure his health." The court did not explain, however, why the state was not bound by its representation to the court that the theory under which it was prosecuting the defendant was that the living conditions in the defendant's apartment posed a risk to the mental health of *any* child. Once the state had made those representations, the defendant was entitled to believe that, if the state did not meet its burden of proving that theory beyond a reasonable doubt, she could not be convicted, regardless of whether the evidence would have supported a claim that Daniel's mental health was endangered because he was particularly fragile. Thus, she was not on notice that there was any need to raise doubts about that issue during trial.

In our recent decision in *State* v. *Robert H.*, 273 Conn. 56, 83, 866 A.2d 1255 (2005), we adopted the reasoning in *Cola* v. *Reardon*, 787 F.2d 681, 693 (1st Cir.), cert. denied, 479 U.S. 930, 107 S. Ct. 398, 93 L. Ed. 2d 351 (1986), that "in order for any appellate theory to withstand scrutiny . . . it must be shown to be not merely before the jury due to an incidental reference, but as part of a coherent theory of guilt that, upon [review of] the principal stages of trial, can be characterized as having been presented in a focused or otherwise cognizable sense." We adopted this rule "as the standard by which to gauge whether evidence introduced at trial, but not relied on by the state in its legal argument, is properly cognizable by an appellate court when evaluating the sufficiency of the evidence." *State* v. *Robert H.*, supra, 83. After reviewing the trial record, we conclude that the state, by its own clear statement, based its theory of prosecution of the first two counts, including the risk of injury charge presently at issue, on an objective standard. In addition, it is well established that

"[o]ur rules of procedure do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade." (Internal quotation marks omitted.) *Larobina* v. *McDonald*, 274 Conn. 394, 402, 876 A.2d 522 (2005). Accordingly, we apply an objective standard in addressing the defendant's claim that she had no notice that the conditions in her apartment fell within the scope of § 53-21 (a) (1).

After applying this standard, we conclude that the statute is unconstitutionally vague as applied to the defendant's conduct. The state has pointed to no statutes, published or unpublished court opinions in this state or from other jurisdictions, newspaper reports, television programs or other public information that would support a conclusion that the defendant should have known that the conditions in her apartment posed an unlawful risk to the mental health of a child. Cf. *State* v. *Padua*, supra, 273 Conn. 154–55 and n.25 (ordinary juror could know from prior judicial decisions, statutes, television programs, movies, newspapers, and websites that oral ingestion of marijuana likely would cause physical injury to child); *State* v. *Payne*, supra, 240 Conn. 778 (prior published opinions provided defendant with fair warning that requiring children to expose themselves was violation of § 53-21). Rather, the state implicitly relies on an "I know it when I see it" standard. *Jacobellis* v. *Ohio*, 378 U.S. 184, 197, 84 S. Ct. 1676, 12 L. Ed. 2d 793 (1964) (Stewart, J., concurring) (stating that, although it is difficult to define obscenity, "I know it when I see it"). We recognize that there may be generally accepted housekeeping norms and that it may be common knowledge that, all things being equal, a clean and orderly home is preferable to a dirty and cluttered home. The same could be said of any number of conditions and actions that affect a child's well-being. It may

be common knowledge, for example, that drinking milk is healthier than a constant diet of soft drinks, reading books is preferable to constant exposure to television programs, large cars are safer than small cars, playing computer games is safer than riding a bicycle, and so on. All of these comparisons, however, involve virtually infinite gradations of conduct, making it extremely difficult, if not impossible, for an ordinary person to know where the line between potentially harmful but lawful conduct and unlawful conduct lies or, indeed, whether that line exists at all. Not *all* conduct that poses a risk to the mental or physical health of a child is unlawful. Rather, there is an acceptable range of risk.

The trial court appears to have recognized the difficulty in discerning the line between lawful and unlawful conduct in this context. Nevertheless, the court implicitly determined that the jury reasonably could have concluded that the defendant should have known that the extreme clutter and unpleasant odor in her apartment created a situation that was well on the wrong side of that line,[6] particularly in light of Daniel's "troubled and fragile" state of mind.[7] We have concluded,

---

[6] The trial court concluded that it was within the knowledge of an *ordinary juror* that the conditions were likely to have injured the mental health of a child, and did not directly address the question of the defendant's knowledge. If an ordinary juror could have known of the causal connection between the conditions in the apartment and the risk of injury to a child, however, it necessarily follows that that causal connection was or should have been within the defendant's knowledge.

[7] Specifically, the trial court focused on the fact that Daniel exhibited poor hygiene and on the conditions of the defendant's home, which discouraged frequent bathing. In support of the latter conclusion, the court noted that clutter prevented the bathroom door from being closed for privacy and was a hindrance to using the bathroom. The court did not appear to find, however, that Daniel's poor hygiene was the direct *result* of the cluttered condition of the bathroom. There was no evidence, for example, that the clutter prevented the defendant or Kara from bathing regularly and using the toilet. Indeed, the court concluded that Daniel's "emotional distress manifested itself in severe hygiene problems." Moreover, if the court had believed that Daniel's body odor, bad breath and habit of defecating in his pants were a direct result of the cluttered condition of the bathroom, the court logically

however, that the state was obligated to prove beyond a reasonable doubt that the defendant knew or should have known that the conditions would constitute a risk of injury to the mental health of *any* child. Although the defendant reasonably could have been aware that the conditions were not optimal, we are not persuaded that the nature and severity of the risk were such that the defendant reasonably could not have believed that they were within the acceptable range.

Moreover, although the trial court recognized that the evidence showed that employees of the department had inspected the defendant's apartment during late 2001, and had closed its file on the family only days before Daniel's suicide, it failed to draw the critical inference that the only experts in child safety who had knowledge of the conditions in the defendant's home during the relevant period apparently had concluded that they were *not* so deplorable as to pose an immediate threat to Daniel's mental health.[8] We do not suggest that the department's failure to take action constituted *conclusive* evidence that the conditions in the apartment did not pose a risk of injury to the mental health of a child. It does constitute evidence, however, that the conditions in the apartment did not pose such an obvious risk that it would be within the knowledge of an ordinary person.

could not have found that the conditions in the apartment posed no risk to the defendant's physical health.

[8] It is possible that the conditions in the apartment at the time of the department's visits were not as cluttered and dirty as they were at the time of Daniel's suicide. If that was the case, however, then that would tend to show only that the apartment was not always in the condition that it was in on January 2, 2002. Indeed, the state presented little evidence from which the jury could have concluded that those conditions were typical, whereas several witnesses for the defendant testified that they were atypical. Nevertheless, construing the evidence most favorably to the state, we conclude that the jury reasonably could have concluded that the conditions had existed in a comparably messy state throughout the entire period alleged in the substitute information.

Finally, the jury unavoidably was made aware during trial that Daniel had exhibited a variety of strange behaviors, was frequently emotionally upset and ultimately had killed himself. There were several possible explanations for Daniel's state of mind and behavior, however, including the relentless bullying that he endured at school and his inherently fragile psyche. Even if it is assumed that the state fairly could rely on evidence of Daniel's suicide to prove that the conditions in the apartment in fact caused injury to Daniel's mental health, that evidence was not competent to prove that such harm was foreseeable.[9] As we have suggested, actual effects are not necessarily foreseeable effects.[10]

---

[9] The trial court stated that "[t]he fact that [Daniel] committed suicide was relevant evidence concerning the risk to [him] (and the defendant did not object to introduction of the evidence about [his] death), but was not itself an element of the offense charged here. The same violation, creating and maintaining a situation that endangered [a] child's mental health, would have existed even had [Daniel] *not* committed suicide." (Emphasis in original.) Thus, the trial court recognized that evidence of Daniel's suicide was relevant only in determining whether Daniel actually suffered harm to his mental health. Moreover, the court appears to have recognized that such evidence was potentially prejudicial in that it could have led the jury to believe that, because Daniel's mental health somehow had been injured, the injury must have been the foreseeable result of the conditions in the apartment.

[10] We find the application of hindsight to be particularly troubling in this context. If it is the state's position that the conditions in the defendant's apartment on January 2, 2002, posed a foreseeable risk to the mental health of children, then similar conditions around the state should have been subject to criminal prosecution before now. As we have indicated, the state has not pointed to any published or unpublished judicial opinions, newspaper articles or other sources of information indicating that such prosecutions have occurred. It seems unfair, and even cruel, both to potential defendants and to potential victims, to prosecute a defendant on the basis of such conditions only when a child actually has suffered some catastrophic harm. Put another way, the state cannot decline to prosecute persons who maintain such conditions because it believes that the risk to children either is within an acceptable range or is speculative and then, only when catastrophic harm actually occurs, use that as evidence that the risk was unacceptable and foreseeable.

The cases relied on by the state in which this court and the Appellate Court have upheld convictions under § 53-21 (a) (1) do not persuade us to the contrary. See *State* v. *Smith*, supra, 273 Conn. 206; *State* v. *Padua*, supra, 273 Conn. 146–59; *State* v. *Payne*, supra, 240 Conn. 768–69; *State* v. *Ritrovato*, 85 Conn. App. 575, 589–90, 858 A.2d 296, cert. granted on other grounds, 272 Conn. 905, 863 A.2d 699 (2004); *State* v. *Smalls*, 78 Conn. App. 535, 546–48, 827 A.2d 784, cert. denied, 266 Conn. 931, 837 A.2d 806 (2003). In *Padua* and *Smith*, the conduct that constituted risk of injury was itself a crime, independent of the health risk that it posed to children. See *State* v. *Padua*, supra, 142 (defendants convicted of conspiring to sell marijuana within 1500 feet of public housing project); *State* v. *Smith*, supra, 208 (defendant convicted of possession of narcotics). Similarly, in *Payne*, *Ritrovato* and *Smalls*,[11] the defendants engaged in discrete criminal acts that created immediate, specific and acute threats to the children's mental health. See *State* v. *Payne*, supra, 769 (defendant convicted of coercion after forcing three children under threat of death to urinate into cup); *State* v. *Ritrovato*, supra, 587–88 (defendant convicted of various drug offenses after giving LSD to child); *State* v. *Smalls*, supra, 536–37 (defendant convicted of murder after shooting child's father in presence of child). When a defendant knows that he is engaged in conduct that is sufficiently dangerous to be criminalized, the defendant is on notice that exposure to that conduct could injure a child's mental health. In the present case, the state concedes that being messy is not, in and of itself, unlaw-

---

[11] Neither *Ritrovato* nor *Smalls* directly addressed the question of whether the state presented sufficient evidence to establish that the defendant knew or should have known of the risk of mental injury to a child. See *State* v. *Ritrovato*, supra, 85 Conn. App. 589–90 (defendant claimed evidence was insufficient to establish that substance he gave child was LSD); *State* v. *Smalls*, supra, 78 Conn. App. 546–48 (defendant claimed evidence was insufficient to establish he knew child was present when he shot victim).

ful, and points to no objective standards for determining the point at which housekeeping becomes so poor that an ordinary person should know that it poses an unacceptable risk to the mental health of a child.[12]

We are mindful that § 53-21 (a) (1) is broadly drafted and was intended to apply to any conduct, illegal or

---

[12] At oral argument before this court, the state argued that household conditions that are sufficiently squalid to justify removal of a child from the home are sufficiently squalid to support a conviction under § 53-21 (a) (1). It further argued that the conditions in the present case met that standard, and that the department had "made a mistake" when it closed its file on Daniel without taking action against the defendant. That proposed standard, however, provides no more guidance to potential defendants than does the statute itself. Moreover, our review of the case law from other jurisdictions reveals that other courts have found that conditions much worse than those found in the defendant's apartment did not justify removal of a child from the home. See *In the Interest of D.S.*, 217 Ga. App. 29, 31, 456 S.E.2d 715 (1995) (children wrongfully taken from mother when home had no gas or other means to heat water for bathing and cleaning, mother was unemployed, drug paraphernalia was found in home, "[t]he kitchen was littered with dirty dishes, hardened liquid soiled the kitchen floor . . . food [was rotting on the counters], there were live and dead roaches in the kitchen cabinets, on the counters and in the refrigerator [and] . . . the carpeting in the house was soiled and emanated a strong odor of animal discharge, and . . . there was a dead rat in the bathroom that had been there so long that only the skull remained"); *Doyle* v. *Dept. of Protective & Regulatory Services*, 16 S.W.3d 390, 395 (Tex. App. 2000) (evidence that small one bedroom apartment was shared with eight to ten other people and had roaches and inoperable oven and stove was insufficient to establish threat to physical or emotional well-being of children); cf. *Dept. of Children's Services* v. *M.P.*, 173 S.W.3d 794, 799–800, 815 (Tenn. App. 2005) (young child properly removed from parents after child found in dirty diaper, smelling of foul odor, with matted hair, drinking spoiled milk from moldy "sippy" cup and evidence showed home was extremely filthy and contained pornography, drug paraphernalia, plates of uneaten molding food and apparently used condom and where hazardous debris covered entire property, wiring was exposed, and child had participated in sex acts with parents); *In re Safriet*, 112 N.C. App. 747, 749, 753, 436 S.E.2d 898 (1993) (hydrocephalic, developmentally delayed, hearing impaired fourteen year old child who "appeared regularly [at school] with unwashed hair, filthy underwear, unclean body, dirty clothing, and foul smelling" properly removed from mother who had "extremely cluttered trailer with no electricity and several windows broken out . . . no permanent residence . . . [and] minimal contact with [her child]" after he was removed from her home).

not, that foreseeably could result in injury to the health of a child.[13] We do not rule out the possibility that a home environment could be so squalid that an ordinary person should be expected to know that it poses a risk to the mental health of a child. The testimony in the present case established, however, that there was no sign in the defendant's apartment of rats, mice or other vermin, animal or human waste, or rotting food or garbage. Moreover, the trial court found that the conditions were not so bad that they would pose a threat to a child's physical health.[14] The evidence showed only that the apartment was extremely cluttered and had an unpleasant odor of uncertain origin.[15] We cannot conclude that the defendant was on notice that these conditions were so squalid that they posed a risk of injury to the mental health of a child within the meaning of § 53-21 (a) (1). Accordingly, we conclude that the statute is unconstitutionally vague as applied to the defendant's conduct.

The judgment is reversed and the case is remanded to the trial court with direction to grant the defendant's motion for judgment of acquittal.

In this opinion the other justices concurred.

BORDEN, J., with whom PALMER, J., joins, concurring. I fully agree with and join the well reasoned major-

[13] It is not illegal to leave a residence to go to the movies, for example, but it is almost certainly a violation of § 53-21 (a) (1) to leave a three year old alone in a residence to go to the movies.

[14] It may be that household conditions that are likely to result in physical injury to a child, such as disease, animal bites or traumatic injury, are so obviously dangerous that an ordinary person should know that they pose a risk to the mental health of a child within the meaning of § 53-21 (a) (1). We need not decide that question in the present case, however.

[15] We further note that our careful review of the evidence reveals that much of the clutter consisted of Christmas related items, such as presents, cards, wrapping paper, books, toys, seasonal decorations, knickknacks and other items suggesting that the defendant had attempted to provide a cheerful holiday for her children.

ity opinion. I write separately, however, to emphasize the following points.

When determining whether the defendant, Judith Scruggs, had notice that the conditions in her apartment fell within the scope of General Statutes § 53-21 (a) (1), the trial court should have applied the objective standard advocated for by the state. Specifically, contrary to the trial court's memorandum of decision, which characterized this case as a "hard case, [but] not a close case," and improperly focused on the fact that Daniel Scruggs' physical and mental frailty made the risk to his mental health obvious, the defendant's culpability should have been gauged by reference to the likely effect of the conditions in the defendant's apartment on the mental health of *any* twelve year old child. This standard reflects the state's theory of criminal liability specifically articulated in response to the defendant's motion for judgment of acquittal at the end of the state's case-in-chief.

In my view, analyzing this case under the objective standard, it remains a close call with respect to whether the defendant had adequate notice that her conduct made her susceptible to criminal liability. What tips the balance in favor of a conclusion that the defendant had inadequate notice and, therefore, that § 53-21 (a) (1) is unconstitutionally vague as applied to the defendant's conduct, is the evidence regarding the investigation of the case by the department of children and families (department).

The record reflects that the department had opened a file on Daniel in the months before his suicide and, only days before his suicide, had conducted a home visit and inspected the living conditions there. The department closed its file six days prior to Daniel's suicide. There also was uncontroverted evidence that the department's investigator instructed the defendant

to "keep Daniel home until he [could be] transferred to the new school."

Thus, only days before Daniel's death, the agency of the state of Connecticut that is dedicated to protecting children from abuse and neglect, had, by its conduct and words, sent a clear message to the defendant that the department saw no significant cause for concern regarding Daniel's health and welfare. Indeed, the department's message was that the defendant should keep Daniel home from school in the very conditions that the same state of Connecticut, through its criminal prosecutorial arm, later charged created an unreasonable risk to his mental health. Although, of course, the law enforcement arm of the state is not bound by a prior determination, express or implied, of the department, from a standpoint of fair notice, the defendant reasonably cannot be expected to make the legal distinction between the two agencies' subject matter jurisdictions. From the viewpoint of the ordinary citizen, it is not fair, and does not comport with adequate notice, for the state to say, in effect, we have no concern for Daniel's health by virtue of his living conditions, and then to say, but we will prosecute the defendant criminally for maintaining those same living conditions.

As noted by the majority, "[a] statute . . . [that] forbids or requires conduct in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. . . . Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." (Citations omitted; internal quotation marks omitted.) *State* v. *Cavallo*, 200 Conn. 664, 667, 513 A.2d 646 (1986). This standard has not been met when the state's child protection and criminal prosecution arms come to different conclusions based on the same conditions in the same time frame.

The state claims that the department made a mistake in its assessment of the likely effect of Daniel's living conditions on his mental health, and that such a mistake does not absolve the defendant of criminal liability. This argument is unpersuasive. Regardless of whether the department made a mistake by closing its investigation and recommending that the defendant keep Daniel home, it does not change the fact that the department's recommendation deprived the defendant of fair notice that her conduct would be susceptible to criminal liability under § 53-21 (a) (1). Put simply, in the absence of authoritative sources that speak to the level of housekeeping that places the defendant's conduct outside the scope of criminal liability, whether it be statute, court cases, newspaper reports, or some other public information, the defendant was entitled to rely on the department's implicit conclusion, on the day that it was given, that her home was within an acceptable range of cleanliness. Accordingly, I agree with the majority that § 53-21 (a) (1) is unconstitutionally vague as applied to the defendant's conduct.