ELIZABETH EGAN ET AL. *v.* PLANNING BOARD
OF THE CITY OF STAMFORD ET AL.
(AC 32371)

DiPentima, C. J., and Alvord and West, Js.

644

Argued January 17—officially released July 10, 2012

*John W. Mullin*, assistant corporation counsel, for the appellant (named defendant).

*Daniel A. Benjamin*, with whom were *Ronald M. Gold* and, on the brief, *Derek Mello*, for the cross appellant (defendant Michael Innaurato).

*John R. Harness*, for the appellees (named plaintiff et al.).

*Opinion*

WEST, J. The defendants, the planning board of the city of Stamford and subdivision applicant Michael Innaurato,[1] appeal from the judgment of the trial court sustaining the aggrieved plaintiffs' appeal[2] from the

---

[1] Innaurato is designated as a cross appellant in this appeal and has filed a separate brief. Because the planning board and Innaurato raise the same issues on appeal, we collectively refer to them as the defendants.

[2] The plaintiffs who originally brought this case were Elizabeth Egan, Dana Tyler, Jean Barden, Robert Barden, Philip Stolz and Suzanne Stolz. Egan and the Bardens were found by the trial court to be statutorily aggrieved because they own property abutting or within 100 feet of the proposed subdivision. The trial court found that the other plaintiffs were not aggrieved because no evidence was presented as to their status, and, therefore, they are not parties to this appeal.

planning board's approval of Innaurato's subdivision application. On appeal, the defendants claim that the trial court improperly substituted its judgment for that of the planning board when the court interpreted (1) a conservation easement to be inconsistent with the zoning requirement that an accessway lot[3] provide an "unobstructed legal accessway" to the street and (2) a lot frontage regulation to require frontage to be measured along a street "which affords the principal means of access" to the lot. We affirm the judgment of the trial court.

The following facts are not in dispute. On February 13, 2008, Innaurato filed an application to subdivide his 6.39 acre lot located on Ingleside Drive in Stamford. The lot borders Spring Hill Lane East (private lane), a private road, to the north, over which the lot does not have any access rights. Approximately 40 percent of the western side of the lot is occupied by a pond and wetlands. The lot is zoned RA-2 for single-family dwellings, requiring a minimum lot size of approximately two acres and minimum frontage of 200 feet. The subdivision plan submitted by Innaurato divided the lot into three lots, B-1, B-2, and B-3. All three lots are approximately two acres each. On lots B-1 and B-2, Innaurato proposed to build six-bedroom, single-family dwellings. Lot B-1 abuts the private lane to the north for a total length of approximately 288 feet and Ingleside Drive to the east, for a total length of 87 feet. Access to lot B-1 is through a driveway off of Ingleside Drive. There are no access rights to the private lane from lot B-1. Lot B-2 is an interior "accessway" lot and abuts lot B-1 to the north and B-3 to the south. Lot B-2 does not abut

[3] Under the Stamford zoning regulations, an accessway lot lacks the minimum frontage requirement but is permitted under the zoning regulations so long as access to the lot is provided through an "unobstructed legal accessway" held in the same ownership as the accessway lot. See Stamford Zoning Regs., §§ 3 (A) (56) and 7 (O).

a street except for a twenty-five foot wide accessway abutting Ingleside Drive. The accessway to lot B-2 has a steep slope and is heavily wooded. Vehicular access to lot B-2 is provided through a common driveway through lot B-1.[4] Lot B-3 contains an existing dwelling and other buildings.

The planning board held a public hearing on the subdivision application on May 27 and June 17, 2008. At the conclusion of the June 17 hearing, the board approved the application subject to fourteen conditions. Conditions one and two required that Innaurato dedicate an "Open Space Preserve/Conservation Area" over 2.8 acres of the entire subdivided property and file a standard "[c]onservation [e]asement [a]greement" over those designated areas. Those conditions require that the area designated as a conservation easement must be "maintained in a natural state except as may be authorized by the Environmental Protection Board (EPB) . . . ."[5] The accessway portion of lot B-2 was included as one of those areas subject to conditions one and two.

The plaintiffs appealed to the Superior Court, claiming that the board's grant of Innaurato's subdivision application violated the zoning regulations in the following ways: (1) lot B-2, as an accessway lot, is not served

---

[4] The plaintiffs do not challenge the legality of the driveway easement to lot B-2. Stamford subdivision regulation § 5.2.6 provides in relevant part that "[t]he applicant's intent to provide vehicular access from a lot to a street via easement over one or more abutting lots shall be subject to review and approval by the Board. . . ."

[5] The record provides a copy of a standard easement agreement which applies to the accessway area of lot B-2 and provides in relevant part: "That no structures of any kind, including without limitation fences, sewage disposal systems, wells, and watering systems, shall be placed or erected upon or within the Conservation Areas until application therefore (with plans and specifications of such structures, together with a statement of the purpose for which such structures will be used) has been filed with, and prior written approval obtained from, the EPB or its successor agencies."

by an unobstructed legal accessway as required in the zoning regulations and (2) lot B-1 does not meet the minimum frontage requirements of the zoning regulations.[6] The court, in its memorandum of decision, sustained the plaintiffs' appeal, finding that in both instances, there was no substantial evidence to support the planning board's interpretation of the zoning regulations. The planning board and Innaurato appealed from the trial court's judgment after this court granted their petitions for certification.

We now identify the applicable standard of review. "Our Supreme Court has stated that [u]nder our well established standard of review, [w]e have recognized that [a]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that . . . deference . . . to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . . *Heim* v. *Zoning Board of Appeals*, 289 Conn. 709, 714–15, 960 A.2d 1018 (2008); *Borrelli* v. *Zoning Board of Appeals*, 106 Conn. App. 266, 270, 941 A.2d 966 (2008); *Munroe* v. *Zoning Board of Appeals*, 75 Conn. App. 796, 803, 818 A.2d 72 (2003) ([i]t is our job, as an appellate court, to construe the relevant zoning regulation because . . . the outcome . . . eventually will depend on a legal interpretation of the regulation

---

[6] The plaintiffs made a third claim in their appeal to the Superior Court, claiming that the lot lines were tortured in violation of the zoning regulations. Because the court sustained the plaintiffs' appeal, the court did not address this third claim.

by an appellate court)." (Internal quotation marks omitted.) *Goulet* v. *Zoning Board of Appeals*, 117 Conn. App. 333, 337, 978 A.2d 1160, cert. denied, 294 Conn. 909, 982 A.2d 1082 (2009).

"Because the interpretation of the regulations presents a question of law, our review is plenary. . . . Additionally, zoning regulations are local legislative enactments . . . and, therefore, their interpretation is governed by the same principles that apply to the construction of statutes. . . . Moreover, regulations must be interpreted in accordance with the principle that a reasonable and rational result was intended . . . . The process of statutory interpretation involves the determination of the meaning of the statutory language [or . . . the relevant zoning regulation] as applied to the facts of the case, including the question of whether the language does so apply." (Internal quotation marks omitted.) *Trumbull Falls, LLC* v. *Planning & Zoning Commission*, 97 Conn. App. 17, 21–22, 902 A.2d 706, cert. denied, 280 Conn. 923, 908 A.2d 545 (2006); see also *Alvord Investment, LLC* v. *Zoning Board of Appeals*, 282 Conn. 393, 416, 920 A.2d 1000 (2007); R. Fuller, 9A Connecticut Practice Series: Land Use Law and Practice (3d Ed. 2007) § 33:7, p. 261.

"A zoning ordinance is a local legislative enactment, and in its interpretation the question is the intention of the legislative body as found from the words employed in the ordinance. . . . The words employed are to be interpreted in their natural and usual meaning. . . . The language of the ordinance is construed so that no clause or provision is considered superfluous, void or insignificant. . . . The regulations must be construed as a whole and in such a way as to reconcile all their provisions as far as possible. . . . [R]egulations are to be construed as a whole since particular words or sections of the regulations, considered separately, may be lacking in precision of meaning to afford a standard

sufficient to sustain them. . . . *Fedus* v. *Zoning & Planning Commission*, 112 Conn. App. 844, 849–50, 964 A.2d 549, cert. denied, 292 Conn. 904, 905, 973 A.2d 103, 104 (2009); see 9A R. Fuller, supra, § 34:6, pp. 299–303." (Internal quotation marks omitted.) *Mountain Brook Assn., Inc.* v. *Zoning Board of Appeals*, 133 Conn. App. 359, 368–69, 37 A.3d 748 (2012). At the same time, our review of the factual findings of the planning board is guided by the substantial evidence standard of review. See *Quality Sand & Gravel, Inc.* v. *Planning & Zoning Commission*, 55 Conn. App. 533, 540, 738 A.2d 1157 (1999).

I

We first consider the issue of whether the placement of a conservation easement, among other restrictions, on the accessway of an accessway lot violates the Stamford zoning regulations. On the basis of the facts and record in this case, we disagree with the planning board's interpretation and conclude that its determination that lot B-2 complied with the zoning regulations lacks substantial evidence in the record.

We now set forth the relevant language from the zoning regulation. Section 3 (A) (56) of the zoning regulations defines an accessway lot as "a lot which has less than the required minimum frontage but which complies with the provisions of [§ 7 (O) of the zoning regulations]." Stamford Zoning Regs., § 3 (A) (56). Section 7 (O) provides in relevant part that "[a]ccessway lots . . . shall be permitted . . . provided that each such accessway lot has access to a street by means of an *unobstructed legal accessway* held in the same ownership as the accessway lot . . . ."[7] (Emphasis

---

[7] Section 7 (O) of the zoning regulations also requires accessway lots in zone RA-2 to be "designed [so] that a circle of [200 feet] can be drawn within the boundaries of the lot . . . ." Additionally, § 7 (O) specifies the setback requirements for an accessway lot.

added.) Id., § 7 (O). The court concluded that the conservation easement was inconsistent with the requirement of an "unobstructed legal accessway." In essence, the court found that restrictions on the accessway *obstructed* legal access to lot B-2. We agree.

The defendants make several arguments. First, the defendants argue that the planning board has engaged in a time-tested practice of interpreting "unobstructed legal accessway" in § 7 (O) of the zoning regulations to restrict only physical obstacles along with a time-tested practice of preserving natural resources through the use of common driveways in compliance with the subdivision regulations. The defendants also argue that the conditions placed over the accessway do not obstruct *legal* access to the lot because *actual* access to lot B-2 is provided by the common driveway.

## A

First, we must determine whether the planning board's interpretation of the zoning regulation is entitled to special deference, based on a time-tested interpretation. The defendants argue that the court should give special deference to the planning board's interpretation of "unobstructed legal accessway" to restrict physical obstructions only in the accessway. Additionally, the defendants argue that the planning board has engaged in a time-tested practice of utilizing paper accessways to provide flexibility to preserve environmentally sensitive areas.[8] Our Supreme Court has "determined . . . that . . . deference . . . to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to]

---

[8] The defendants use the term "paper accessway" to mean an accessway that is designated as the legal accessway for the lot but one that does not actually provide the vehicular ingress and egress to and from the lot.

. . . a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) *Heim* v. *Zoning Board of Appeals*, supra, 289 Conn. 714. "We have accorded deference to such a time-tested agency interpretation of a [regulation], but only when the agency has consistently followed its construction over a long period of time, the [regulatory] language is ambiguous, and the agency's interpretation is reasonable." *State Medical Society* v. *Board of Examiners in Podiatry*, 208 Conn. 709, 719, 546 A.2d 830 (1988). The court found that "[t]he defendants have referred the court to nothing in the record to indicate that the board itself has engaged in a long-standing, time-tested practice of deeming similar conditions not to constitute obstructions to legal access."[9] On the basis of our own careful review of the record, we agree with the court. Additionally, the defendants have not cited any prior judicial interpretation of the zoning regulation. Therefore, we conclude that the planning board's interpretation of "unobstructed legal accessway" is accorded no special deference.

B

Without any special deference to the board's interpretation, we now interpret what constitutes an obstruction to an "unobstructed legal accessway," as required by § 7 (O). The term "unobstructed legal accessway" is not defined in the regulations. "[W]ords and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases,

[9] The planning board cites *Newman* v. *Planning & Zoning Commission*, 293 Conn. 209, 217, 976 A.2d 698 (2009), as a recent example of our Supreme Court's deference to a commission's historical interpretation of a regulation. In concluding that the commission had engaged in a historical interpretation, the court in *Newman* determined that not only had the commission consistently interpreted the regulation but the commission's interpretation had been memorialized in a checklist prepared by the commission "many years ago . . . ." Id., 218.

and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." (Internal quotation marks omitted.) *Moon* v. *Zoning Board of Appeals*, 291 Conn. 16, 21, 966 A.2d 722 (2009). "The words used in zoning ordinances are to be interpreted according to their usual and natural meaning and the regulations should not be extended, by implication, beyond their expressed terms." *Coppola* v. *Zoning Board of Appeals*, 23 Conn. App. 636, 641, 583 A.2d 650 (1990). "A term that is employed in the regulations may not be interpreted to mean whatever the commission chooses it to mean. That would render it impossible for a party to discern the true meaning of the term and, thus, to know whether compliance with the regulation is possible. . . . A commission's regulations must be reasonably precise in subject matter and reasonably adequate and sufficient to give both the commission and those affected by its decision notice of their rights and obligations." (Internal quotation marks omitted.) *200 Associates, LLC* v. *Planning & Zoning Commission*, 83 Conn. App. 167, 174, 851 A.2d 1175, cert. denied, 271 Conn. 906, 859 A.2d 567 (2004). "Whenever possible, the language of zoning regulations will be construed so that no clause is deemed superfluous, void or insignificant. . . . The regulations must be interpreted so as to reconcile their provisions and make them operative so far as possible." (Internal quotation marks omitted.) *Graff* v. *Zoning Board of Appeals*, 277 Conn. 645, 653, 894 A.2d 285 (2006).

We turn, therefore, to the text of the regulation. Section 7 (O) refers to the "accessway" separately from the entire "accessway lot." Therefore, "accessway" in the context of "unobstructed legal accessway" refers to the part of the accessway lot connecting the interior portion of the lot with the street. For the meaning of the term "unobstructed," which is not defined in the

regulations, we turn to the dictionary. See *Moon* v. *Zoning Board of Appeals*, supra, 291 Conn. 25–26. The verb "to obstruct," is defined as "1. [t]o block or fill (a passage) with obstacles; make impassable; 2. To interfere with, impede, or retard." The American Heritage Dictionary (New College Ed. 1981) p. 907. An "obstruction" is defined as "1. [o]ne that gets in the way; an obstacle. 2. [a]n act or instance of impeding or obstructing." Id. Both definitions reference the noun "obstacle," which is defined as "[o]ne that opposes, stands in the way of, or holds up progress toward some goal." Id.

On the basis of the common meaning of the terms contained in the phrase "unobstructed legal accessway," we cannot say that conditions restricting the accessway to lot B-2 do not "[stand] in the way of" nor "[hold] up progress" in the legal accessway to lot B-2.[10] As part of the board's approval of the subdivision application, it required that the accessway to lot B-2 "be maintained in a natural state except as may be authorized by the Environmental Protection Board (EPB) . . . ." In addition, a standard conservation easement agreement would be required to be filed over those same designated areas. See footnote 5 of this opinion. Those conditions require the owner of lot B-2 to seek the permission of the EPB in order to utilize the accessway for *any purpose* other than open space.[11]

[10] The defendants argue that the term "unobstructed legal accessway" is ambiguous and direct us to extratextual evidence in support of their interpretation. Under the principles of statutory construction, only if the text of the regulation is ambiguous may we consider extratextual evidence. See *State* v. *Peeler*, 271 Conn. 338, 434, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). Because we do not conclude that the phrase "unobstructed legal accessway" is ambiguous, we do not examine any extratextual evidence.

[11] Whether the "accessway" is "legally unobstructed" as the trial court construed the language, or the "legal accessway" is "unobstructed" as the defendants argue, the root of the issue is the meaning of the term "unobstructed."

Here, the obstacle impeding the accessway is not physical, but rather an encumbrance requiring future approval from a municipal body. Such an encumbrance over the accessway of lot B-2 hinders the use and development of the accessway portion of the lot. The court, in its memorandum of decision, stated that "[t]he parties agree that there is nothing in the record to indicate that the EPB has granted such permission contingent upon a future need for access or that it has done so with respect to other conserved accessways or that a future EPB might do so." This determination by the court has not been challenged on appeal. Indeed, the record is silent on any future approval by the EPB to use the conservation easement area for any purpose other than maintaining it in its natural state.[12]

[12] Our Supreme Court has held that when analyzing the administrative action of one agency depends upon the later approval by another agency, there must be substantial evidence in the record that the second agency's approval of such action was reasonably probable. *Gerlt* v. *Planning & Zoning Commission*, 290 Conn. 313, 326, 963 A.2d 31 (2009); see also *Jarvis Acres, Inc.* v. *Zoning Commission*, 163 Conn. 41, 50–51, 301 A.2d 244 (1972) (record contained insufficient evidence to support conclusion that state road serving proposed development would be improved); *Wilson* v. *Planning & Zoning Commission*, 162 Conn. 19, 24–25, 291 A.2d 230 (1971) (record contained no evidence that provision would be made for highway and traffic flow changes required to alleviate congestion caused by zone change); *Faubel* v. *Zoning Commission*, 154 Conn. 202, 211, 224 A.2d 538 (1966) (record contained no evidence that town would supply roads and utilities necessary to comply with zoning laws); cf. *Stiles* v. *Town Council*, 159 Conn. 212, 222, 268 A.2d 395 (1970) (on basis of evidence presented, town council reasonably could have concluded that interstate highways essential to successful operation of proposed development would be constructed).

Because the record in this case is silent with regard to *any* probability of future approval by the EPB, there is no substantial evidence that the EPB would approve of any deviation from the terms of the conservation easement. Innaurato argues that because condition three for the board's approval of the subdivision application restricts vehicular access to lot B-2 to the common driveway easement over lot B-1, the approval by the board is not dependent upon the later actions of the EPB. Essentially, Innaurato seems to argue that condition three forecloses the ability of the EPB to *ever* approve of any vehicular access to lot B-2 other than via the common driveway easement. Whether or not, at some future date, the EPB would have the discretion to approve vehicular access to lot B-2 is irrelevant to

## C

Next, the defendants argue that the conservation easement over lot B-2 does not obstruct *legal* access to the lot because *actual* access to lot B-2 is provided by the common driveway over the adjacent lot B-1. We disagree.

In its memorandum of decision, the court agreed with the defendants that "the regulations do not require construction of a driveway within the accessway. That, however, begs the question. The issue is rather *whether the regulation mandates that the accessway be legally unobstructed*, whether or not a driveway is ever constructed within its boundaries." (Emphasis added.) We agree. The board argues that the common driveway complies with the provisions of Stamford subdivision regulation § 5.2.6.[13] Although *actual* access to lot B-2 is provided by a common driveway, in accordance with the *subdivision regulations*, that does not eliminate the requirement of an "unobstructed legal accessway" under § 7 (O) of the *zoning regulations*. The subdivision regulations and zoning regulations must be read together.[14] Therefore, a subdivision plan for an accessway lot that prescribes a paper accessway *and* an actual accessway via a common driveway can be compliant with both the zoning regulations and subdivision regulations. In the present case, however, the

our inquiry. Conditions one and two require the approval of the EPB if the owner of lot B-2 wants to alter the natural state of the accessway. As we determined previously, these conditions amount to an obstruction of the accessway.

[13] Section 5.2.6 of the subdivision regulations provides in relevant part: "The applicant's intent to provide vehicular access from a lot to a street via easement or common driveway over one or more abutting lots shall be subject to review and approval by the Board. . . ."

[14] The subdivision regulations incorporate the zoning regulations by reference. Section 3.6.3 of the subdivision regulations provides in relevant part that "[t]he [Planning] Board shall consider the layout of the proposed subdivision with due regard to the . . . purpose and intent of zoning regulations . . . ."

board added additional conditions for the paper accessway, namely, designating the area as open space/conservation area and requiring the filing of a standard conservation easement agreement. Those conditions, as discussed previously, obstruct the accessway, therefore violating § 7 (O) of the zoning regulations, which requires an "unobstructed legal accessway . . . ."[15]

Under the facts and circumstances of this case, we conclude that the planning board's finding that lot B-2 complied with the accessway lot provisions of § 7 (O) of the zoning regulations was not supported by the record, and therefore, the court properly sustained the plaintiffs' appeal with respect to this issue.

## II

We next consider the issue of whether the planning board properly interpreted the lot frontage requirements to allow lot frontage for lot B-1 to be measured along the private lane. On the basis of the facts and record in this case, we disagree with the board's interpretation and conclude that its determination that lot B-1 conforms to the frontage requirements lacks substantial evidence in the record.

We begin with the text of the regulations. Section 3 (A) (60) of the zoning regulations provides that "lot, frontage" is "[t]he distance between the side lines of a lot measured along the front lot line. . . ." Stamford Zoning Regs., § 3 (A) (60). Lot B-1 is a corner lot that abuts both Ingleside Drive and the private lane but

---

[15] The board and Innaurato both argue that if this court affirms the trial court's interpretation of an "unobstructed legal accessway," it will subvert the public policy goals of protecting sensitive environmental areas because lot owners will be forced to construct driveways through environmentally delicate areas. We reject this argument. Our interpretation cannot be construed to prevent the use of paper accessways to protect environmentally sensitive areas, but we hold more narrowly, that the *additional conditions* placed on the accessway to lot B-2 violate the zoning regulation requirement of an "unobstructed legal accessway . . . ." Stamford Zoning Regs., § 7 (O).

lacks the minimum frontage along Ingleside Drive.[16] In approving the subdivision, the planning board permitted Innaurato to measure frontage along the private lane. In sustaining the plaintiffs' appeal, the court found that although § 3 (A) (60) does not expressly require that the front lot line abut a street, such a requirement is "necessarily implicit" based on the dictionary definition of frontage, which the court defined as "the measure in feet . . . of the boundary between a street or highway and an abutting property."[17] (Internal quotation marks omitted.) On the basis of the court's determination that frontage must be measured along a street, the court turned to the definition of "street" in the zoning regulations. Section 3 (A) (96) provides that a "street" is "[a] public thoroughfare including road, highway, drive, lane, avenue, place, boulevard, and any other thoroughfare *which affords the principal means of access to abutting property*." (Emphasis added.) The court interpreted § 3 (A) (60) and (96) together to require that frontage be measured along a street that abuts the lot *and* affords the principal means of access for that lot. Because the private lane does not afford the principal means of access to lot B-1, the court held that it lacked the minimum frontage requirements and therefore violated the zoning regulations. We agree.

On appeal, the defendants make several arguments. First, the defendants argue that the planning board has engaged in a time-tested interpretation of "lot, frontage" that does not require that the street provide the principal means of access. Second, the defendants argue that the court confused the definitions of "lot, frontage"

---

[16] Section 4 (AA) (1) (1.5) of the zoning regulations requires that lots in the RA-2 zone have a minimum frontage of 200 feet.

[17] The plaintiffs argue that § 3 (A) (60) does not *define* "lot, frontage" but rather explains how lot frontage is *measured*. Although the trial court turned to the dictionary definition of "frontage," we do not. Whether § 3 (A) (60) defines frontage *or* explains how it is measured is irrelevant to the inquiry because our analysis turns on the meaning of the term "front lot line."

and "street" and thereby engrafted a requirement that frontage be measured along a street that provides the principal means of access to that property.

As we did in part I of this opinion, we must first determine whether to afford any special deference to the board's interpretation of the frontage requirements under the zoning regulations. Innaurato argues that the board has engaged in a time-tested interpretation, but has not pointed to any evidence of a time-tested practice of *not* requiring that the street measured for frontage purposes also afford the principal means of access.[18] We conclude that the record lacks substantial evidence that the planning board has engaged in a time-tested interpretation and therefore we accord no special deference to the planning board's interpretation. See *State Medical Society* v. *Board of Examiners in Podiatry,* supra, 208 Conn. 719.

As in part I of this opinion, our review of the interpretation of the zoning regulations is plenary. Although the definition of "lot, frontage," defined in § 3 (A) (60) of the zoning regulations as "[t]he distance between the side lines of a lot measured along the front lot line," does not make reference to an abutting street, we agree with the court's construction that frontage is measured along an abutting street is "necessarily implicit." "[R]egulations must be interpreted so as to reconcile their provisions and make them [all] operative so far as possible. . . . When more than one construction is possible, we adopt the one that renders the enactment effective

[18] Innaurato references the remarks of chairman of the planning board, who stated at June 17, 2008 meeting, that "the regulations state—*now whether it's clear or not*—that any road whether it's public or private can be used for frontage even if you don't have—cannot use it directly for access." (Emphasis added.) This statement by the chairman demonstrates that the planning board was not clear what the zoning regulations required for frontage along a private street. The planning board's confusion over the frontage requirements as they relate to private streets further demonstrates that the board has not engaged in a time-tested interpretation.

and workable and reject any that might lead to unreasonable or bizarre results." (Internal quotation marks omitted.) *Newman* v. *Planning & Zoning Commission,* supra, 293 Conn. 217. The front lot line of a lot has to abut a street, otherwise it would not be a front lot line. "Front lot line" is not separately defined by the zoning regulations. Apart from § 3 (A) (60), there is only one reference to the term "front lot line" in the zoning regulations. Section 7 (M) provides in relevant part that "[i]n the case of equal frontages the owner may designate *which street line shall be the front lot line* for the purpose of determining the rear lot line." (Emphasis added.) Section 3 (A) (65) defines a "[l]ot [s]treet [l]ine" as "[t]he dividing line between the street and the lot." Reading the zoning regulations together, we interpret the regulations to require that a "front lot line" be measured along a "street line." In our view, measuring frontage along a street renders the regulations workable, and avoids the unreasonable and bizarre results that would occur if lot frontage could be measured along any other abutting land besides a street. Because we interpret lot frontage to be measured along a street and the regulations require that a street afford "the principal means of access to abutting property," frontage necessarily cannot be measured along a private street from which an abutting property does *not* have the right to access.

Innaurato cites *KJC Real Estate Development, LLC* v. *Zoning Board of Appeals,* 127 Conn. App. 16, 15 A.3d 166, cert. denied, 300 Conn. 938, 17 A.3d 472 (2011), in his argument that the definition of street should be considered separate and apart from a consideration of lot frontage. *KJC Real Estate Development, LLC,* is distinguishable from the present case because in that case, the Wilton zoning regulations' definition of "frontage" explicitly stated that frontage "abut[s] on a *public* street." (Emphasis in original; internal quotation marks

omitted.) Id., 21. In that case, the court affirmed the trial court's determination that the street in question constituted a street, but not a *public street,* which was required under the zoning regulations for frontage. Id. In the present case, the definition of "lot, frontage" is silent on whether frontage must be on a street—public or private. We have determined, however, that the Stamford zoning regulations require the frontage be measured along a street, based on the meaning of the term "front lot line" in the definition of "lot, frontage" in the regulations. Although we interpret the zoning regulations to require frontage on a street, we agree with the trial court's determination that under § 3 (A) (96), "street" *can refer to either a public or private street.*[19] Because the private lane qualifies as a "street" under the regulations, such a street must afford the principal means of access for any lot that uses that street to measure frontage.[20] The owner of lot B-1 does not have any right to use the private lane, and thus the private lane cannot afford the principal means of access for the lot. Therefore, because lot B-1 cannot measure frontage along the private lane, and there is not sufficient frontage on Ingleside Drive, the lot fails to meet the frontage requirements.

Under the facts and circumstances of this case, we conclude that the planning board's finding that lot B-1 complied with the frontage requirements of the zoning regulations was not supported reasonably by the

[19] The court determined that the private lane qualifies as "any other thoroughfare" under § 3 (A) (96) of the zoning regulations.

[20] Innaurato argues that the regulation should be interpreted so that once a right-of-way qualifies as a street, it can be used for frontage purposes for *any lot that abuts the street,* including lot B-1. That argument fails because we have interpreted the regulations to require that lot frontage be measured along a street that affords the principal means of access to that lot. Therefore, lot frontage could not be measured along a right-of-way that has been determined to be a "street" under the regulations yet does not afford the principal means of access for the lot.

record, and, therefore, the court properly sustained the plaintiffs' appeal with respect to this issue.

The judgment is affirmed.

In this opinion the other judges concurred.